STATE of Wisconsin, Plaintiff-Appellant,†

v.

Matthew J. TRECROCI, Defendant-Respondent. [Case No. 00–1079–CR]

STATE of Wisconsin, Plaintiff-Appellant,†

v.

Ryan J. FRAYER, Defendant-Respondent. [Case No. 00–1080–CR]

STATE of Wisconsin, Plaintiff-Appellant,†

v.

Ronnie J. FRAYER, Defendant-Respondent. [Case No. 00–1081–CR]

STATE of Wisconsin, Plaintiff-Appellant,†

v.

Scott E. OBERST, Defendant-Respondent. [Case No. 00–1082–CR]

†Petition to review denied.

STATE of Wisconsin, Plaintiff-Appellant,†

v.

Amy L. WICKS, Defendant-Respondent. [Case No. 00–1083–CR]

Court of Appeals

Nos. 00–1079–CR, 00–1080–CR, 00–1081–CR, 00–1082–CR, 00–1083–CR. Submitted on briefs March 9, 2001.—Decided May 2, 2001.

## 2001 WI App 126

(Also reported in 630 N.W.2d 555.)

266

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle,* attorney general, and *David J. Becker,* assistant attorney general.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Robert E. Henak* of *Henak Law Office, S.C.* of Milwaukee.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. NETTESHEIM, J. The State of Wisconsin appeals from a trial court order granting a motion to suppress evidence filed by the defendants, Matthew J. Trecroci, Ryan J. Frayer, Ronnie J. Frayer, Scott E. Oberst and Amy L. Wicks. The police made a warrantless entry into an interior stairway off of an enclosed porch entry to the building. The stairway led to Trecroci's second-floor apartment and to an attic area leased by the Frayers and Oberst. We hold that the defendants had a reasonable expectation of privacy in the stairway, thereby rejecting the State's argument that the stairway was a "common area" not entitled to Fourth Amendment protection. As a result, we uphold the trial court's determination that the ensuing searches of the attic and the apartment were invalid. We also reject the State's argument that Trecroci and Wicks, a guest, did not have standing to challenge the attic search. We affirm the suppression order.

## FACTS

¶ 2. Although the State does not agree with some of the trial court's findings of fact, it does not challenge them given our "clearly erroneous" standard of review.[1] "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2) (1999–2000).[2]

¶ 3. The searches occurred at a building located at 2510 48th Street in the city of Kenosha. The building is a two-story residence that had been subdivided into two apartment units—one on the first floor and the other on the second floor. An attic is located above the second floor. The defendant Trecroci owns the residence and he lived in the second-floor apartment.

¶ 4. During the late evening hours of October 17, 1998, City of Kenosha Police Officer Russell Davison was investigating a hit-and-run accident. Davison learned that Edward Echols was involved in the accident, that he may have left the scene in a blue Pontiac motor vehicle, and that his last known address was 2510 48th Street in Kenosha. Davison and a fellow officer, Kenneth Clelland, traveled to that location.

¶ 5. Upon arrival, the officers observed a blue Pontiac parked near the residence. The officers also saw a man, later identified as defendant Ryan Frayer,

---

[1] We commend the State for its concession on this standard of review question, and we wish more appellate litigants would do likewise. While an appellate challenge to factual findings and credibility determinations may occasionally be appropriate, in the vast majority of cases such determinations are unassailable. In fact, such a challenge can be frivolous. *See Lessor v. Wangelin*, 221 Wis. 2d 659, 669, 586 N.W.2d 1 (Ct. App. 1998).

[2] All references to the Wisconsin Statutes are to the 1999–2000 version.

exit from the back area of the property. The officers asked Ryan who owned the Pontiac. Ryan replied that the owner was his brother's friend and they were in the upper apartment of the residence. Davison told Ryan that he wished to speak with the owner of the vehicle. Ryan then turned around and proceeded back towards the residence with the officers following. The group walked through a gate in the fence that enclosed the rear of the property, up a short set of exterior steps, and into an enclosed porch area. Two doors led off of this area—one to the first-floor apartment unit and the other to a stairway which serviced the second-floor apartment and the attic area. The stairway door was equipped with a deadbolt lock and a spring hinge that kept the door closed. A doorbell button serviced the upstairs apartment.

¶ 6. While Ryan and the officers were in the enclosed porch area, Clelland said that he smelled marijuana. At this remark, Ryan stopped. Davison told Ryan to move out of the way. When Ryan failed to obey, Davison proceeded through the door and into the stairway area. As he climbed the stairs, Davison continued to smell marijuana and also observed a fan venting to the outside of the building. Davison knew from his experience that fans are sometimes used to vent marijuana.

¶ 7. At the top of the stairs, Davison heard voices coming from the attic area and he observed a door leading to this area. This door was equipped with a padlock, but the door was partially ajar. Davison opened the door by pulling outward, revealing a further stairway leading to the attic area. Davison observed marijuana leaves in the stairway. He also saw a man, later identified as defendant Oberst, coming down the stairs with his hand in his pocket. Davison told Oberst

to remove his hand, but Oberst did not obey. When the two met, Davison conducted a pat down of Oberst and discovered a cutting shears in Oberst's pocket. When Davison reached the top of the attic stairs, he observed defendants Ronnie Frayer and Wicks. Later investigation revealed that Wicks was on the premises as a guest of her fiancé, Ronnie Frayer.

¶ 8. All of the subjects were placed under arrest.[3] Additional officers were called to the scene and a search of the attic turned up evidence that the attic was being used for drying and processing marijuana.

¶ 9. Trecroci was not present at the time of the events we have described. However, after the police learned that Trecroci owned the residence, Officer Michael Wilkinson, who knew Trecroci, was dispatched to look for him. Wilkinson located Trecroci and transported him back to the residence.[4] About the same time, Officer Thomas Vieth, the field supervisor of the Kenosha County Controlled Substances Unit, arrived on the scene. Vieth and Trecroci had a conversation, after which Trecroci talked with Wilkinson. Trecroci told Wilkinson that he had been asked to consent to a search of his apartment and he wanted Wilkinson's advice. Wilkinson told Trecroci to look around, and that they (the officers) were not going anywhere. The police also told Trecroci that if he did not consent to the search, they would obtain a search warrant. Trecroci then consented to the search of his apartment, which turned up additional marijuana evidence.

¶ 10. Oberst later gave a written statement at the police department indicating that he and the Frayers had rented the attic area from Trecroci. In

---

[3] Another person who was in the attic was also arrested and later charged. That person is not involved in this appeal.

[4] Trecroci was not under arrest at this time.

exchange, they provided marijuana to Trecroci. Oberst also stated that Trecroci knew that the attic area was used to process marijuana.

## TRIAL COURT PROCEEDINGS

¶ 11. Following a preliminary hearing, the State filed an information charging all the defendants with party to the crime of the manufacture of a controlled substance pursuant to Wis. Stat. §§ 939.05 and 961.41(1)(h)3 and party to the crime of possession of a controlled substance with intent to deliver pursuant to §§ 939.05 and 961.41(1m)(h)3.[5]

¶ 12. All of the defendants filed motions to suppress, challenging the search of the attic. Trecroci additionally filed a motion to suppress, challenging the search of his apartment. These motions challenged each sequential step of the police procedure, starting with the entry into the curtilage of Trecroci's backyard and ending with the search of Trecroci's apartment. The trial court conducted lengthy evidentiary hearings on the motions. The court also received written briefs from the parties.

¶ 13. On March 2, 2000, the trial court issued a written decision granting the motions to suppress. The court rejected the State's argument that the warrantless police entry into the stairway was valid based on Ryan's consent. Instead, the court held that Ryan's consent terminated when he stopped at the door leading to the stairway in response to Clelland's statement that he smelled marijuana. The court also held that the

_____

[5] Ronnie Frayer was further charged with possession of a controlled substance pursuant to Wis. Stat. §§ 961.41(3g)(c) and 961.48(1). This charge resulted from a search of Frayer at the jail. The parties do not address the effect of the trial court's ruling on this charge. Neither do we.

search could not be justified under the law of "plain view" because the police were actively engaged in investigating the possible presence of marijuana based on their observations.[6]

¶ 14. In addition, the trial court rejected the State's arguments that the defendants did not have standing to challenge the attic search. Instead, the court held that the defendants had a reasonable expectation of privacy in the attic area. Finally, the trial court ruled that Trecroci's consent to the search of his apartment was involuntary.

¶ 15. Following the trial court's ruling, the State filed a motion for reconsideration arguing, for the first time, that the police entry into the stairway leading to the second story was justified by the combination of probable cause based on the smell of marijuana and exigent circumstances based on the presence of some of the defendants in the dwelling. In support, the State cited to *State v. Hughes*, 2000 WI 24, 233 Wis. 2d 280, 607 N.W.2d 621, a decision released after the trial court's ruling. The trial court distinguished the *Hughes* case and denied the State's motion for reconsideration.

¶ 16. The State appeals. However, the State's notice of appeal embraces only the trial court's initial order granting the defendants' motions to suppress. The notice does not reference the court's later order denying the State's motion for reconsideration.

---

[6] We agree with the State that the trial court's ruling on this particular point was incorrect. In *State v. Guy*, 172 Wis. 2d 86, 101, 492 N.W.2d 311 (1992), the supreme court eliminated the "inadvertence" element of former plain view law. However, this error is of no consequence because, on appeal, the State does not argue that the entry and searches were justified under the law of "plain view."

## DISCUSSION

### Scope of Our Review

¶ 17. In large measure, the State relies on the argument it made on the reconsideration motion—that the circumstances confronting the police established both probable cause and exigent circumstances under *Hughes* to justify the police entry into the stairway and the subsequent entry into the attic. *See id.* at ¶ 18. The defendants respond that we should not countenance the State's arguments under *Hughes* because those issues were first introduced into this case by the State's motion for reconsideration, and the State has not appealed from the order denying the reconsideration motion.

¶ 18. In *Ver Hagen v. Gibbons*, 55 Wis. 2d 21, 197 N.W.2d 752 (1972), the appellant appealed from an order denying a motion for rehearing of a prior grant of summary judgment to the respondents. *Id.* at 23. The supreme court dismissed the appeal saying, "it has frequently been held that an order entered on a motion to modify or vacate a judgment or order is not appealable where, as here, the only issues raised by the motion were disposed of by the original judgment or order." *Id.* at 25. The court further said that in order for such an order to be appealable, "[the movant] must present issues other than those determined by the order or judgment for which review is requested . . . ." *Id.* at 26.

¶ 19. In *Harris v. Reivitz*, 142 Wis. 2d 82, 417 N.W.2d 50 (Ct. App. 1987), the appellant also appealed from an order denying a motion for reconsideration. *Id.* at 85. In analyzing the *Ver Hagen* "new issues" test, the court of appeals held that the test should be liberally applied. *Harris*, 142 Wis. 2d at 88–90. Viewing the reconsideration motion in that light, the court con-

cluded that the reconsideration motion raised new issues, and the court proceeded to review the order denying the reconsideration on its merits. *Id.* at 89–90.

¶ 20. The State acknowledges that its reconsideration motion probably injected new issues into this case under *Ver Hagen* and *Harris* and that, under ordinary circumstances, it would be required to appeal the denial of the reconsideration order. However, the State says that it is "arguable" whether it could have appealed the order under the facts of this case since the basis for its reconsideration motion was a recent decision. In support, the State cites to *Mack v. Joint School District No. 3*, 92 Wis. 2d 476, 285 N.W.2d 604 (1979). There, the appellants appealed from an order granting summary judgment and from an order denying their motion for a rehearing. *Id.* at 479. Applying the *Ver Hagen* "new issues" rule, the court said:

> In the present case appellants, in their motion for a rehearing, merely cited a recent case and argued that the case required the trial court to withdraw its decision, and thus, they presented the same issues which the trial court decided when granting summary judgment. Those issues can be reviewed on that portion of this appeal which challenges the judgment granting respondent's motion for summary judgment. Thus, the appeal from the order of the trial court denying appellants' motion for a rehearing is dismissed.

*Id.* at 485.

¶ 21. We disagree with the State that this language "arguably" creates a different rule when the basis for a reconsideration motion is a recent decision. While the basis for the reconsideration motion in *Mack* was a recent decision, the court did not carve out a different rule for that circumstance. Instead, the court

applied the *Ver Hagen* rule. Although the appellants in *Mack* were armed with a recent case, the core issues remained the same. Here, like *Mack*, the State is also armed with a recent case—*Hughes*. But unlike *Mack*, the State also introduced new issues into the case—probable cause and exigent circumstances.

¶ 22. In summary, when the basis for a reconsideration motion is a recent decision, the test for appellate jurisdiction is still the *Ver Hagen* rule. Here, the State's motion for reconsideration injected an entirely new issue into the case—a claim that the combination of probable cause and exigent circumstances served to justify the police conduct under *Hughes*. If the State wanted to complain about the trial court's rejection of that claim on reconsideration, it was duty bound to appeal that ruling. It has not. Therefore, the *Hughes* issue is not properly before us. We accordingly limit our review to the matters covered by the trial court's original order suppressing evidence.

### Standard of Review

¶ 23. When reviewing a trial court's ruling on a motion to suppress evidence on Fourth Amendment grounds, we will uphold the trial court's factual findings unless clearly erroneous. *State v. Knight*, 2000 WI App 16, ¶ 10, 232 Wis. 2d 305, 606 N.W.2d 291, *review denied*, 234 Wis. 2d 177, 612 N.W.2d 733 (Wis. Apr. 26, 2000) (No. 99–0368–CR). However, whether a search is reasonable under the Fourth Amendment is a question of law that we review de novo. *Id.* Whether a defendant has standing to raise a Fourth Amendment claim also presents a question of law. *Id.* The same is true as to whether a defendant has consented to a search. *State v.*

275

*Rodgers*, 119 Wis. 2d 102, 108–09, 349 N.W.2d 453 (1984). As we have noted, the State does not dispute the trial court's factual findings. Instead, the State disputes the court's ultimate rulings that the searches did not pass constitutional muster.

### *Stairway Leading to the Second Floor and Attic: Reasonable Expectation of Privacy*

¶ 24. As noted, the defendants' constitutional challenges targeted each level of the police conduct: the initial entry into the backyard, the entry into the enclosed porch, the entry into the stairway leading to the second floor, the entry into the attic area, the search of the attic, and the search of Trecroci's apartment. The trial court's opinion did not discuss the first two levels of the police conduct—the entries into the backyard and the enclosed porch. Instead, the court began its analysis with the police entry into the stairway leading to the second floor of the dwelling. Rejecting the State's argument that Ryan had not terminated his consent prior to this entry, the court held that the warrantless police entry into the stairway was not permitted.

¶ 25. We begin our analysis at the same point because we agree with the trial court that the warrantless entry of the police into the stairway area was illegal. However, the basis of our holding is different than that of the trial court because the State does not pursue its consent or "plain view" arguments on appeal. Instead, the State argues that the stairway was a common area not protected by the Fourth Amendment.

██

¶ 26. The trial court's written decision did not expressly address the validity of the police entry into

the stairway area in terms of "common area." Instead, the court addressed this issue in terms of whether the defendants had standing to challenge the attic search. During that discussion, the court properly focused on whether the defendants had a reasonable expectation of privacy in the stairway area leading to the upper levels of the residence. When assessing a defendant's standing to challenge a search under the Fourth Amendment, the critical inquiry is "whether the person . . . has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *accord State v. Fillyaw*, 104 Wis. 2d 700, 710, 312 N.W.2d 795 (1981). So we read the court's decision to have answered the State's "common area" argument even though the court did not expressly invoke that phrase.

¶ 27. The State likens the stairway to the common areas of a multi-unit apartment complex. According to the State, a tenant does not have a reasonable expectation of privacy in such common areas. The defendants argue otherwise, particularly in a case such as this where the dwelling houses only a few rental units. This issue presents a matter of first impression in Wisconsin. The parties cite to cases from other jurisdictions in support of their competing positions. We set out some of them for illustration purposes.

¶ 28. The cases cited by the State include the following holdings. A tenant does not have a reasonable expectation of privacy in the hallway of an apartment building such that a police officer could not testify about observations he made and conversations he overheard in the hallway. *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977). A tenant does not have a reasonable expectation of privacy in the hallway of a twenty-seven story apartment complex housing seven

277

apartments on each level. *United States v. Nohara*, 3 F.3d 1239, 1240, 1242 (9th Cir. 1993) (citing *Eisler* favorably and also noting a series of cases with similar holdings). A tenant has no reasonable expectation of privacy in the hallway of an apartment complex even though a locked door guarded the area. *United States v. Barrios-Moriera*, 872 F.2d 12, 14–15 (2nd Cir. 1989).

¶ 29. The defendants counter with cases such as *United States v. Carriger*, 541 F.2d 545, 548–50 (6th Cir. 1976), where the court held that a tenant had a reasonable expectation of privacy in the corridor of an apartment building. The defendants also cite to Justice Jackson's concurring opinion in *McDonald v. United States*, 335 U.S. 451, 458 (1948) ("[I]t seems to me that each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry.").

¶ 30. More germane to this case, the defendants point to cases which have drawn a distinction between larger apartment complexes and duplexes or smaller dwellings. In *United States v. Fluker*, 543 F.2d 709 (9th Cir. 1976), the court held that a tenant had a reasonable expectation of privacy to an outer doorway leading to an entry way or corridor which, in turn, led to the doors of the two living units. *Id*. at 714–17. The court stated:

> We begin with the fact that this building was not one containing many individual apartment units, but rather was comprised of only two apartments on the basement level and the landlord's living quarters on the upper floor. Thus, the entry way was one to which access was clearly limited as a matter of right to the occupants of the two basement

apartments, and it is undisputed that the outer doorway was always locked and that only the occupants of the two apartments and the landlord had keys thereto. In light of the size of the building, then, we find significant the fact that the door to the hallway giving access to the two apartments was locked; the two lower-level tenants thus exercised considerably more control over access to that portion of the building than would be true in a multiunit complex, and hence could reasonably be said to have a greater reasonable expectation of privacy than would be true of occupants of large apartment buildings.

*Id.* at 716. Interestingly, the *Eisler* and *Nohara* decisions, which held that a corridor of an apartment complex was a common area not entitled to Fourth Amendment protection, distinguished *Fluker* on the basis of the size of the dwellings. *Eisler*, 567 F.2d at 816 (noting that in Fluker the defendant's apartment was isolated from other areas of the building); *Nohara*, 3 F.3d at 1242.

¶ 31. The defendants also cite to *People v. Killebrew*, 256 N.W.2d 581 (Mich. Ct. App. 1977): "Generally, a hallway shared by tenants in a private multiple-unit dwelling is not a public place. . . . In the case at bar there were only two apartments sharing a common hallway, entry to which was limited by right to the occupants. These occupants certainly could expect that a high degree of privacy would be enjoyed in that area." *Id.* at 583. In *Fixel v. Wainwright*, 492 F.2d 480 (5th Cir. 1974), the court determined that a tenant of a four-unit apartment building had a reasonable expectation of privacy in a backyard. *Id.* at 484. While that expectation was not as great as if it were a purely private residence, the court also held that the area "is not as public and shared as the corridors, yards or

other common areas of a large apartment complex . . . ."
*Id.*

¶ 32. The State, however, has duplex cases that support its argument. In *United States v. McCaster,* 193 F.3d 930 (8th Cir. 1999), the court held that a hall closet in the back of a duplex was a common area not entitled to Fourth Amendment protection. *Id.* at 933. The court noted that the two other tenants, as well as the landlord, also stored items in the closet and the defendant had not taken steps to exclude others from the area. *Id.* In *United States v. Holland,* 755 F.2d 253 (2nd Cir. 1985), the court reached a similar result stating:

> [W]e never have held that the common areas must be accessible to the public at large nor have we required a quantified amount of daily traffic through the area as a basis for determining that a common area is beyond an individual's protected zone of privacy.
>
> This rule gives tenants the benefit of much-needed police protection in common hallways . . . while it preserves for them the privacy of their actual place of abode, their apartments. It also lays down a clearly-defined boundary line for constitutionally permissible police action, which is readily apparent to an officer in the field, without a need for counting apartments, analyzing common-hallway traffic patterns or interpreting the mental processes of a suspect relating to an area used in common with others.

*Id.* at 256 (citations omitted).

¶ 33. In resolving the issue, we are tempted to adopt bright-line rules in this unsettled area of search and seizure law. Under such rules, the police could better regulate their conduct and we could more easily

gauge the legality of such conduct. This is true whether the rule would favor the State or the individual. However, we conclude that the interests of the Fourth Amendment are better served by assessing each case on its individual facts. This approach assures that certain cases do not slip between the cracks of a general rule, causing the suppression of evidence which, under closer scrutiny, should have been admitted, or allowing for the admission of evidence which, under similar scrutiny, should have been disallowed. Moreover, whether a person has a reasonable expectation of privacy seems by its very nature to call for an examination of the particular facts of each case. *See United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000) ("Whether a legitimate expectation of privacy exists in a particular place or item is a determination to be made on a case-by-case basis.").

¶ 34. We therefore turn to the particular facts of this case and look to whether the defendants had a reasonable expectation of privacy in the stairway leading to the upper levels of the dwelling. We exempt Wicks from this discussion because of her status as a guest. We will speak to her circumstances later when we address her standing to challenge the attic search.

██

¶ 35. The defendants bear the burden of establishing their reasonable expectation of privacy by a preponderance of the evidence. *State v. Whitrock*, 161 Wis. 2d 960, 972, 468 N.W.2d 696 (1991). Whether a person has a reasonable expectation of privacy depends on (1) whether the individual has exhibited an actual, subjective expectation of privacy in the area inspected and in the item seized, and (2) whether society is willing to recognize such an expectation of privacy as reasonable. *State v. Thompson*, 222 Wis. 2d 179, 186,

585 N.W.2d 905 (Ct. App. 1998). Here, we have little difficulty concluding that the defendants exhibited an actual subjective expectation of privacy. They so testified and their actions in equipping the doorway leading to the entrance to the stairway with a deadbolt lock supports that testimony. Nor is there any suggestion from the evidence that third parties had unfettered access to the stairway. We do not understand the State to dispute this first element of the test.

██

¶ 36. Instead, the State rests its argument on the second prong of the test: whether society is willing to recognize the defendants' subjective expectation of privacy as reasonable. *Id.* This is an objective test. *Id.* On this element of the test, we look to the following factors:

1. Whether the person had a property interest in the premises;

2. Whether the person was legitimately on the premises;

3. Whether the person had complete dominion and control and the right to exclude others;

4. Whether the person took precautions customarily taken by those seeking privacy;

5. Whether the person put the property to some private use; and

6. Whether the claim of privacy is consistent with historical notions of privacy.

*Id.*

¶ 37. The first two factors support the defendants' claim of a reasonable expectation of privacy in the stairway leading to the upper levels. Trecroci owned the building, he lived in the second-floor apartment and the stairway served as access to his apartment.

The other defendants, save Wicks, had rented the attic area and the stairway also served as their access to those quarters. As such, all of the defendants had a property interest in the stairway and further had a legitimate right to use and be present in the stairway.

¶ 38. Next we address the third and fourth factors: the degree of dominion and control which the defendants exercised over the stairway area and the nature of the precautions they took to assure privacy. The door in the enclosed porch area that controlled entry into the stairway was equipped with a spring hinge which kept the door closed. More importantly, the door was equipped with a deadbolt lock that required the use of a key to unlock. Trecroci had provided the other defendants with a key to this lock. Thus, the only occupants who had access to the stairway were Trecroci as the owner and a resident, and the other defendants as tenants. The first-floor tenant did not have a key to this door.

¶ 39. While Trecroci and the other defendants undoubtedly allowed third parties to enter and use the stairway with their consent, that alone does not negate a reasonable expectation of privacy. *See, e.g., O'Connor v. Ortega*, 480 U.S. 709, 721–24 (1987) (access by others to an employee's work area does not negate an employee's reasonable expectation of privacy to his or her work area), *Chapman v. United States*, 365 U.S. 610, 616–17 (1961) (a landlord's limited right to enter a tenant's dwelling did not negate the tenant's reasonable expectation of privacy where the landlord's entry exceeded that limited right). The deadbolt lock revealed that use of the stairway by third parties was not unbridled. Instead, the defendants regulated and controlled the use of the stairway by such persons.

¶ 40. We reject the State's argument that simply because Trecroci rented the attic area to the other defendants and thereby allowed them to use the stairway, all of the defendants, including Trecroci himself, forfeited any reasonable expectation of privacy to the stairway. As we have noted, this dwelling was not a large apartment complex in which many persons would be coming and going through the common areas on a regular basis. Instead, Trecroci and the other defendants were the only ones entitled to unlimited use of the stairway and they otherwise regulated the use of the area by third parties. Moreover, unlike a conventional apartment complex where all tenants would have access to all the common areas, here the first-floor tenant did not have access to the stairway. These factors support the defendants' reasonable expectation of privacy claim.

■

¶ 41. Next, we address the fifth and sixth factors: the use of the property by the defendants and whether their claim of privacy is consistent with historical notions of privacy. As to Trecroci, our analysis will be brief. Trecroci owned and lived on the property. He used the stairway to access his living quarters and, as such, it was an essential adjunct to those quarters. The Fourth Amendment accords the highest degree of protection to a person's home. *See New York v. Burger,* 482 U.S. 691, 700 (1987); *State v. Schwegler,* 170 Wis. 2d 487, 495, 490 N.W.2d 292 (Ct. App. 1992). Trecroci's use of the property was clearly private and his claim of privacy is in keeping with historical notions of privacy. These factors support Trecroci's reasonable expectation of privacy claim.

¶ 42. As to the other defendants, however, the question is closer. These defendants rented the attic space from Trecroci for the principal purpose of conducting their criminal enterprise, although the trial court also found that they used the area for socializing. However, we bear in mind that the Fourth Amendment protects people, not property. *Katz v. United States*, 389 U.S. 347, 351 (1967). And, just as with a residence, a warrantless search of a commercial premise is presumed unreasonable. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978); *Schwegler*, 170 Wis. 2d at 495–96. The commercial use of a property reduces, but does not eliminate, the expectation of privacy. *See Schwegler*, 170 Wis. 2d at 495.

¶ 43. By its very nature, the criminal enterprise of these defendants was not conducted or promoted in the public sphere. Instead, the defendants housed their operation in the covert attic setting of a residential dwelling. They secured and controlled access to the attic by a deadbolt lock at the stairway entrance leading to the second floor and by a padlock on the door leading to the attic itself. Although these defendants used the attic for a commercial and criminal enterprise, the use was secretive and private. That conduct is consistent with historical notions of privacy attendant to such activity. Under these facts, we conclude that the reduced expectation of privacy which these defendants held in the stairway did not serve to justify the warrantless police entry under the facts of this case.

¶ 44. On this basis, we uphold the trial court's order suppressing the evidence garnered from the attic search.[7]

### Search of Trecroci's Apartment

#### 1. Fruit of the Poisonous Tree

██

¶ 45. The next question is the effect of the illegality of the attic search on the later search of Trecroci's apartment under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *State v. Phillips*, 218 Wis. 2d 180, 204–13, 577 N.W.2d 794 (1998). The State correctly observes that the trial court did not invalidate the search of Trecroci's apartment under the "fruit of the poisonous tree" doctrine. Instead, the court held that Trecroci's consent to the search was involuntary. However, we are entitled to affirm a trial court's ruling on different grounds if the effect of our holding is to uphold the trial court's ruling. *State v. Holt*, 128 Wis. 2d 110, 124, 382 N.W.2d 679 (Ct. App. 1985).

██

¶ 46. A "fruit of the poisonous tree" inquiry focuses on whether the discovery of the tainted evidence has come at the exploitation of the illegal entry or was sufficiently attenuated as to dissipate the taint

---

[7] By a separate argument, the State challenges Trecroci's standing to challenge the attic search. That argument focuses on Trecroci's reasonable expectation of privacy in the attic. However, as our discussion reveals, we deem the controlling question to be whether Trecroci had a reasonable expectation of privacy in the stairway leading to the second floor. Since he did and since the police entry into the stairway was therefore illegal, we end the analysis at that point.

caused by that entry. *Phillips*, 218 Wis. 2d at 204. Here, Trecroci gave his consent after he was confronted with the fruits of the attic search and the option of consenting to a search of his apartment or having the police obtain a search warrant.

¶ 47. Assuming for purposes of this discussion that Trecroci's consent was voluntary, "[t]he mere fact that consent to search is voluntary . . . does not mean that it is untainted by prior illegal conduct." *Id*. When considering whether the casual chain has been sufficiently attenuated from the illegal police conduct, we look to: (1) the temporal proximity of the official misconduct and the seizure of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id*. at 205.

¶ 48. As to the first factor, we do not deem the temporal proximity factor as very helpful to the discussion because Trecroci was not present when the police entered the dwelling. Instead, he was brought to the scene later and the record is silent as to whether he knew when the police had actually entered his building. However, we will assume that this factor supports the State.

¶ 49. The third factor also supports the State. The police were initially investigating a hit-and-run incident. This matter did not convert into a drug investigation until the police were already in the enclosed porch entry and Clelland smelled marijuana. Moreover, there is no evidence of violence, threats, or physical abuse by the police to gain entry into the stairway. *See id*. at 211. We see no evidence of purposeful or flagrant police conduct.

¶ 50. However, it is the second factor which most heavily weighs against the State and which, in our judgment, controls the issue. Trecroci's consent was the direct product of the evidence and information obtained as a result of the illegal entry and search. This is unlike *Phillips* where the illegal entry had not produced any evidence before the police obtained the defendant's voluntary consent to search the defendant's bedroom. *Id.* at 210. Thus, the defendant's consent in *Phillips* was not tainted or influenced by any information or evidence improperly obtained by the police. Therefore, the supreme court held that the police did not exploit their unlawful entry into the defendant's home. *Id.* at 212. Just the opposite occurred here. The fruits of the illegal entry and search were the tools employed by the police to obtain Trecroci's consent and they were the catalysts for Trecroci giving consent. Moreover, as the next portion of our discussion will reveal, the police improperly advised Trecroci that they could obtain a search warrant for his apartment if he did not consent to the search.

¶ 51. In summary, there were no intervening circumstances that attenuated the official misconduct from Trecroci's consent. Therefore, we uphold the court's order suppressing the evidence obtained as a result of the search of Trecroci's apartment on this ground.

## 2. *Voluntariness of Trecroci's Consent*

¶ 52. Alternatively, we uphold the trial court's ruling that Trecroci's consent to the search of his apartment was involuntary. Consent is not lightly inferred

and the burden is on the State to show a free, intelligent, unequivocal and specific waiver. *Rodgers*, 119 Wis. 2d at 107.

¶ 53. According to the trial court's findings, Oberst was still on the scene or had just left when Wilkinson delivered Trecroci to the scene. At this time, the police advised Trecroci that if he did not consent to a search of his apartment, they would obtain a search warrant. However, the police did not have probable cause to search Trecroci's apartment until Oberst later implicated Trecroci in a written statement he provided at the police department following his arrest.

¶ 54. The police may not threaten to obtain a search warrant when there are no grounds for a valid warrant. *State v. Kiekhefer*, 212 Wis. 2d 460, 473, 569 N.W.2d 316 (Ct. App. 1997). The trial court's findings establish that when the police threatened Trecroci with a search warrant, they did not, as yet, have probable cause. Therefore, under *Kiekhefer*, Trecroci's consent was not voluntary.

### Standing of Amy Wicks

¶ 55. We separately address the standing of Wicks to challenge the attic search. As noted, Wicks was present on the premises as a guest of her fiancé, Ronnie Frayer.

¶ 56. We start with the proposition that "a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas*, 439 U.S. at 142. In addition, an overnight houseguest has a legitimate

expectation of privacy in his or her host's home. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990).

¶ 57. However, in this case, the attic area was not used as a residence and Wicks was not an overnight guest. Instead, she was temporarily on the premises as an invitee of her fiancé, Ronnie Frayer. If we were to assess Wicks's relationship to the premises separate and apart from her relationship to the other defendants, it is apparent that she comes up short under the *Thompson* factors. Wicks had no property interest in the premises, she had no dominion or control over the premises, she had no right to exclude others, and she took no precautions to assure privacy. The only factors in her favor were that she was legitimately on the premises and she was using the property for a private, albeit commercial, purpose.

¶ 58. But in *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court explained that the standing of a guest to challenge a search is measured by the guest's relationship to the property *and* the host. In *Carter*, two guests were in an apartment bagging cocaine with the tenant. *Id.* at 86. Holding that the guests had no reasonable expectation of privacy, the Court said, "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id.* at 90.

¶ 59. The State takes this language to mean that only an overnight guest has standing to challenge a search and therefore Wicks lacks standing. But the later language of the Supreme Court in *Carter* shows otherwise:

> Respondents here were obviously not overnight guests, but were essentially present for a business

transaction and were only in the home a matter of hours. There is no suggestion that they had a previous relationship with [the tenant], or that there was any other purpose to their visit. Nor was there anything similar to the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household. While the apartment was a dwelling place for [the tenant], it was for these respondents simply a place to do business.

*Carter*, 525 U.S. 90. This additional language tells us that the holding of *Carter* is not as broad as the State contends. Rather, we read *Carter* to say that, under the facts of that case, the guests had not established a reasonable expectation of privacy in the apartment. But this language also reveals that if the guest's relationship with the host and the host's property is more firmly rooted, a guest may have standing to challenge a search.

¶ 60. That also is how the trial court read *Carter*. And the court's findings of fact reveal the kind of relationship between Wicks and the other defendants and the property which allows for standing under *Carter*. The trial court noted that the defendants, including Wicks, had used the attic area on prior occasions for both their criminal enterprise and for socializing. In addition, Wicks was Ronnie Frayer's fiancé.

¶ 61. In summary, we agree with the trial court that factors absent in *Carter* are present in this case. For that reason, we affirm the trial court's determination that Wicks had standing to challenge the search.

### *CONCLUSION*

¶ 62. We hold that the issue raised in the State's reconsideration motion is not properly before us on

appeal. As to the trial court's original suppression order, we hold that Trecroci, the Frayers and Oberst had a reasonable expectation of privacy in the stairway leading to the second level of the dwelling. As such, these defendants had standing to challenge the police entry into this area. Since the police entry was conducted without a search warrant, the entry was invalid and the ensuing searches of the attic and Trecroci's apartment were illegal. Alternatively, we uphold the trial court's ruling that Trecroci's consent to the search of his apartment was not voluntary. Finally, we hold that Wicks had standing to challenge the search of the attic. We affirm the suppression order.

*By the Court.*—Order affirmed.