STATE of Wisconsin, Plaintiff-Respondent,

v.

Garry C. ESKRIDGE, Defendant-Appellant.†

Court of Appeals

*No. 01–2720–CR. Submitted on briefs April 12, 2002.—Decided May 15, 2002.*

2002 WI App 158

(Also reported in 647 N.W.2d 434.)

† Petition to review denied 9-26-02.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Gregory Bates* of *Bates Law Office*, Kenosha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Stephen W. Kleinmaier*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Nettesheim, P.J., Brown and Anderson, JJ.

¶ 1. ANDERSON, J. Garry C. Eskridge appeals from a judgment of conviction based on a warrantless search of a common area located in the basement of a four-unit apartment building in which he resided. On appeal, he claims that he had a reasonable expectation of privacy and that the evidence was seized in violation of his rights under the Fourth Amendment to the United States Constitution.[1] We disagree. Therefore, we affirm.

¶ 2. On August 28, 2000, Eskridge was charged with possession of cocaine as a second or subsequent

---

[1] The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

offense contrary to WIS. STAT. §§ 961.41(3g)(c) and 961.48(2) (1999–2000).[2] In the ensuing prosecution, Eskridge moved to suppress the evidence. A suppression hearing was held on October 17, 2000. Both sides gave testimony, which was uncontroverted except for disagreement as to whether on August 21, 2000, the front door of the building was locked or unlocked.

¶ 3. At the suppression hearing Eskridge testified that he and his wife were renters of a second-floor apartment in the building and had lived there "a few weeks." Eskridge claimed that the front door to the building was "usually locked" and that the door to the basement was "supposed to be locked." However, Eskridge also stated that the lock on the basement door might have been broken on that day. Eskridge acknowledged that there was a common area of the basement open to all tenants of the building. He said that on August 21 the front door was locked when he came home after work.

¶ 4. Next, the court heard testimony from the two officers involved in the case, Peter Falk and Booker Bennett. Their testimonies explained that on August 21, 2000, the City of Kenosha Police Department received a tip from an informant that "a guy named D was dealing out of one of the apartments [at 4811 - 37th Avenue, a four-unit apartment building] and that he kept his dope in the upstairs hallway closet." According to the informant, the officers would find approximately a quarter ounce of crack at this address. Acting on the tip, the officers went to the apartment building.

¶ 5. Both Falk and Bennett testified that when they arrived at the building, the front door was un-

---

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

locked. Falk testified that during his five years of patrolling the area, he had been in this building ten to twelve times and the door to the building had never been locked. He and Bennett both testified that they had observed a lot of nonresidents of the building coming and leaving through its unlocked front door. Falk said that this building was in a high crime area and that ninety-five percent of the four-plexes in the area had unlocked doors. Bennett testified that from his past experiences with the activities at this building, he knew the front door would be open and unlocked. Falk said that the door to the upstairs hallway was also open. Falk and Bennett proceeded through the open doors, went upstairs, checked the hallway closet and found no drugs.

¶ 6. Falk and Bennett then returned to the first-floor foyer where they saw another open door leading to the basement stairway. Through the open door, Falk could see that a light was on in the basement. The officers thought they might find drugs in the basement because it was their experience that people in apartment buildings sometimes hide drugs in basement areas. Specifically, Falk said that from past informant tips he had learned that

> in these types of four plexes people that are dealing dope lots of times keep it in the basement because if the police hit the house, they won't find it in their house and they won't get in trouble for it supposedly. So I have found numerous types of contraband hidden in the rafters of the basement and furnaces and stuff like that.

Additionally, Bennett testified that they had decided to check the basement because "that was also in the tip."

¶ 7. When Falk and Bennett entered the basement, they saw no one else there. The basement con-

tained a laundry area and locker bins fenced off with chicken wire. While searching the rafters with their flashlights, the officers heard someone (Eskridge) coming down the stairs. Falk said that he heard paper ripping and that he then heard Bennett confront Eskridge. The noise Falk heard was Eskridge tearing paper away from some insulation in order to reach his hand into it. Bennett confronted Eskridge while his hand was still reaching into the insulation. Bennett asked Eskridge why he had his hand up in the insulation and he responded by stating that he was looking for the light switch. Bennett looked into the insulation area where Eskridge's hand had been and located a plastic baggie containing a rock of what appeared to be cocaine. Falk field tested the rock, which tested positive for the presence of cocaine. The officers said it was at this point that they arrested Eskridge.

¶ 8. At the conclusion of the hearing, the trial court stated that it believed the testimonies of the officers over the testimony of Eskridge. The court made a finding that Eskridge's front door was not locked when the officers arrived and entered the building on August 21, 2000. The court further found that once inside the building, the officers came upon and went through a wide open door into the basement. Finally, the court found that, under the circumstances, Eskridge had no expectation of privacy in the common area of the apartment building basement. The trial court denied Eskridge's motion to suppress. Eskridge pled guilty and now appeals the judgment of conviction.

## Standard of Review

¶ 9. When reviewing a trial court's ruling on a motion to suppress evidence on Fourth Amendment

grounds, we will uphold the trial court's factual findings unless clearly erroneous. *State v. Trecroci*, 2001 WI App 126, ¶ 23, 246 Wis. 2d 261, 630 N.W.2d 555, *review denied*, 2001 WI 117, 247 Wis. 2d 1033, 635 N.W.2d 782 (Wis. Sep. 19, 2001) (No. 00–1083–CR). However, whether a search is reasonable under the Fourth Amendment is a question of law that we review de novo. *Id.* Whether a defendant has standing to raise a Fourth Amendment claim also presents a question of law. *Id.* The same is true as to whether a defendant has consented to a search. *Id.*

### Discussion

¶ 10. On appeal, Eskridge does not dispute the trial court's factual findings. Under the clearly erroneous standard, we have no reason to upset these findings. Eskridge disputes only the trial court's ultimate ruling: that the search passed constitutional muster. We first address the State's request that we adopt a bright-line rule that a tenant in an unlocked apartment building with at least four units does not have a reasonable expectation of privacy in the common areas of the stairways, hallways and basement. The State apparently wants us to create a legal gulf between cases where officers enter a two-unit residence (*Trecroci*) and apartments containing four units or more (this case). In the State's view, while there may be a historical notion of privacy in the former, there is no such historical notion in the latter. This is seemingly so because *Trecroci*-type buildings do not usually have common stairways and hallways, while buildings of four or more units usually do. We decline to adopt such a bright-line rule because the suppositions integral to the State's claim often change with the particular facts. The num-

321

ber of units in a building does not define, *ipso facto,* all the variables that must be considered when deciding whether a tenant has a reasonable expectation of privacy in a certain area of the building. Some buildings are always locked, and some are rarely or never locked. Some buildings have common basements and some do not. Some have common areas and some do not. Some have a history of outside traffic and some do not. The number of units in a building is only one factor to consider. For these reasons, we are convinced that a bright-line rule would be inappropriate. Rather, we adhere to the reasoning we provided in *Trecroci,* where we explained that:

> [A case-by-case approach] assures that certain cases do not slip between the cracks of a general rule, causing the suppression of evidence which, under closer scrutiny, should have been admitted, or allowing for the admission of evidence which, under similar scrutiny, should have been disallowed. Moreover, whether a person has a reasonable expectation of privacy seems by its very nature to call for an examination of the particular facts of each case.

*Id.* at ¶ 33 (citation omitted).

¶ 11. We now turn to the particular facts of this case and look to whether Eskridge had a reasonable expectation of privacy in the common area of the basement in the apartment building in which he lived. Eskridge bears the burden of establishing his reasonable expectation of privacy by a preponderance of the evidence. *Id.* at ¶ 35. Whether a person has a reasonable expectation of privacy depends on a two-pronged test as to (1) whether the individual has exhibited an actual, subjective expectation of privacy in the area

inspected and in the item seized; and (2) whether society is willing to recognize such an expectation of privacy as reasonable. *Id.*

¶ 12. We are guided by our decision in *Trecroci*, where, like here, the defendants were charged with drug offenses and moved to suppress evidence obtained during a search of an apartment building. *Id.* at ¶ 1. In *Trecroci*, we held that the defendants exhibited a subjective expectation of privacy because: (1) they so testified, (2) their actions in equipping the doorway leading to the entrance to the stairway with a deadbolt lock supported that testimony, and (3) there had not been any suggestion from the evidence that third parties had unfettered access to the stairway. *Id.* at ¶ 35.

¶ 13. Unlike in *Trecroci*, the only evidence of a subjective expectation of privacy in this case is Eskridge's testimony to this effect:

[Defense Counsel]: Mr. Eskridge is it your expectation in living in that building that the only people that come in through the steel door are you, the other three tenants and people that come in with their permission? Is that accurate?

[Eskridge]: Yes.

When comparing this evidence to the State's evidence to the contrary, we agree with the trial court that Eskridge's testimony does not stack up to proof by a preponderance of the evidence that he had a subjective expectation of privacy. The State offered the following evidence to show that Eskridge did not have a subjective expectation of privacy:

- Falk's testimony that he had been in the building ten

to twelve times in the past five years and the door to the building had never been locked;

- Falk's testimony that the building was in a high crime area and that ninety-five percent of the four-plexes in the area had unlocked doors;

- Bennett's testimony that from his past experiences with the activities at the building, he knew the front door would be open and unlocked;

- Falk and Bennett's testimonies that they had observed a lot of nonresidents of the building coming and leaving through its unlocked front door over the years;

- Falk and Bennett's testimonies that when they arrived at the building on August 21, the front door was in fact unlocked; and

- Falk and Bennett's testimonies that they proceeded through a wide open door leading to the basement stairway and the area inspected.

Thus, where in *Trecroci* there had not been any suggestion from the evidence that third parties had unfettered access to the area inspected, here the State offered credible evidence to suggest that third parties did have unfettered access to the area inspected.

¶ 14. The trial court believed Falk and Bennett's testimonies over Eskridge's testimony. The trial court made a finding that Eskridge's front door was not locked when the officers arrived and entered the building on August 21, 2000. The court further found that once inside the building, the officers came upon and went through a wide open door into the basement. Finally, the court found, and we agree, that under the circumstances, Eskridge had no expectation of privacy in the common area of the apartment building basement.

¶ 15. Given that Eskridge does not prevail on the first prong of the *Trecroci* test, we could end our discussion here. However, with the exception of our holding in *Trecroci*, there is little guidance for the trial courts on this issue. In an effort to provide some direction, we include a discussion of the second prong: whether society is willing to recognize the defendant's subjective expectation of privacy as reasonable. *Id.* at ¶ 36. This is an objective element of the test. *Id.* On this element, we look to the following factors:

1. Whether the person had a property interest in the premises;

2. Whether the person was legitimately on the premises;

3. Whether the person had complete dominion and control and the right to exclude others;

4. Whether the person took precautions customarily taken by those seeking privacy;

5. Whether the person put the property to some private use; and

6. Whether the claim of privacy is consistent with historical notions of privacy.

*Id.*

¶ 16. If Eskridge satisfies all six factors, he prevails on the second prong of the *Trecroci* test. However, Eskridge satisfies only three of the factors. Eskridge was a tenant in a second-floor apartment of the building and all the tenants shared the uncordoned-off basement area, which was the area inspected. This satisfies factors one and two; Eskridge had a property interest in the area inspected and he had a legitimate right to use

and be present in the area inspected. Factor five is satisfied because Eskridge put the area inspected to some private use when he "hid" his drug stash in the insulation located in the area inspected.

¶ 17. Eskridge does not satisfy the remaining factors. He did not have complete dominion and control over the area and he did not have the right to exclude others. This was an uncordoned-off laundry area, open and available to the other tenants of the building. *See United States v. McGrane,* 746 F.2d 632, 633–34 (8th Cir. 1984) (no reasonable expectation of privacy in common area of basement of two-story, four-unit apartment building where the area was accessible to all tenants and the landlord). Thus, he fails on factor three.

¶ 18. Eskridge also fails on factor four because he did not take precautions customarily taken by those seeking privacy. The area inspected was available to tenants *and nontenants* if, as both Falk and Bennett credibly testified, the door to the building was kept unlocked. In fact, the trial court rejected Eskridge's testimony that the door was usually locked and found that the door was unlocked on the day in question. Furthermore, Eskridge never claimed that he made certain the door was locked. We cannot say that hiding drugs in an unlocked, common area, accessible to all tenants, qualifies as taking precautions customarily taken by someone seeking privacy. We add that even a recent case that seemingly supports Eskridge does not support him because, in addition to the court holding that the defendant had a reasonable expectation of privacy in an apartment building common area, it also explained that its holding did *not* extend to common areas of *unlocked* apartment buildings. *State v. Titus,* 707 So.2d 706, 711 (Fla. 1998).

¶ 19. Finally, Eskridge fails on the sixth factor: whether the defendant's claim of privacy is consistent with historical notions of privacy. Here, we conclude that under the facts of this case, Eskridge's claim of privacy is not consistent with historical notions of privacy. Historical notions of privacy do not seem to encompass "common areas" in apartment buildings. As pointed out earlier, common areas in apartment buildings are, by their very definition, not private but shared areas, accessible to and used by other tenants. This conclusion is supported by our examination of case law from other jurisdictions. *See, e.g., Penny v. United States*, 694 A.2d 872, 875 (D.C. 1997) (in holding that there was no reasonable expectation of privacy in the basement of a multi-unit building, the court relied in part on the fact that the tenant did not have the authority to exclude others from the common area of the basement that was entered and searched); *United States v. Hawkins*, 139 F.3d 29, 32–33 (1st Cir. 1998) (the unenclosed area of the basement of the apartment building was a common area for which the defendant as a tenant had no reasonable expectation of privacy); *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) (court observed that "[m]ost other circuits agree a tenant does not have a reasonable expectation of privacy in an apartment building hallway or other common area.").

¶ 20. Accordingly, even if we held that Eskridge had exhibited an actual, subjective expectation of privacy, and we hold that he did not, he would have failed on the second prong of the *Trecroci* test: whether society is willing to recognize the defendant's subjective expectation of privacy as reasonable. The evidence seized from the common area of the basement was not seized in violation of Eskridge's rights under the Fourth

Amendment to the United States Constitution. Eskridge has not established by a preponderance of the evidence that he had a reasonable expectation of privacy. *See Trecroci*, 2001 WI App 126 at ¶ 35. We hold that Eskridge did not have a reasonable expectation of privacy in the common area of the basement in the apartment building in which he lived.

*By the Court.*—Judgment affirmed.