STATE of Wisconsin, Plaintiff-Appellant,

v.

Sean R. Fox, Defendant-Respondent.

Court of Appeals

*No. 2007AP685–CR. Submitted on briefs September 14, 2007.
—Decided August 7, 2008.*

2008 WI App 136

(Also reported in 758 N.W.2d 790.)

85

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Stephen W. Kleinmaier*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Daniel M. Berkos*, Mauston.

Before Higginbotham, P.J., Dykman and Vergeront, JJ.

¶ 1. HIGGINBOTHAM, P.J. The State appeals a circuit court order granting Sean R. Fox's motion to suppress evidence of manufacturing methamphetamine, delivering drug paraphernalia and possession of waste from methamphetamine manufacturing. The dispositive issue is whether Fox has standing under the Fourth Amendment and art. I, § 11 of the Wisconsin Constitution to challenge the warrantless search of a trailer he was using in which the inculpatory evidence was discovered. We conclude that Fox lacked standing and therefore the circuit court erred in reaching the merits of Fox's motion to suppress evidence. Accordingly, we reverse the circuit court's order of suppression and remand for further proceedings.

### Background

¶ 2. The following undisputed facts are taken from the hearing on Fox's motion to suppress and the preliminary hearing.[1] Terry McCoy (Terry), Alan Underwood and Fox arrived at a mobile home in Lyndon

---

[1] We examine evidence presented at Fox's preliminary hearing in reviewing the suppression order while acknowledging our decisions on the question of whether we ordinarily may examine evidence beyond that presented at the suppression hearing when reviewing a suppression order may be inconsistent. The State notes that *State v. Mikkelson*, 2002 WI App 152, 256 Wis. 2d 132, 647 N.W.2d 421, suggests that only suppression hearing evidence should be considered when reviewing a sup-

owned by Terry's mother, Mary McCoy (McCoy), during the early morning hours of August 24, 2004. The three men told a neighbor, Donna Wood-Cahoon, that they planned to stay for a few days and fish. Later that day, all three men returned to Illinois and spent the night at McCoy's home. The next morning, Fox and Underwood returned to the trailer without Terry. McCoy was unaware that Fox and Underwood had returned to the trailer.

¶ 3. The following day, the Juneau County Sheriff's Department received a report that a person traveling in a vehicle owned by Fox had purchased ammonia nitrate fertilizer from a local fertilizer plant. Detective Randy Georgeson of the Juneau County Sheriff's Department learned that Fox and Underwood were using the trailer in Lyndon and stopped by the trailer to investigate. Georgeson observed that the rear door of the trailer was tied to the door frame but left ajar about six inches, and the windows were open but darkened with linens. He smelled a strong odor of gas or

pression order. *See id.*, ¶ 21 ("We are aware of no authority that permits an appellate court to overturn a suppression ruling based on evidence that was not part of the record at the suppression hearing."). However, *State v. Gaines*, 197 Wis. 2d 102, 106 n.1, 539 N.W.2d 723 (Ct. App. 1995), declares that an appellate court may examine preliminary hearing testimony, as well as the record supporting the issuance of a warrant and trial testimony (when applicable) when reviewing a suppression order. We decline to address further this apparent inconsistency. Instead, we choose to examine the preliminary hearing transcript in this case when reviewing the motion to suppress because: (1) Fox cited preliminary hearing testimony when arguing the suppression motion and the State did not object to his use of such evidence; (2) the circuit court relied on preliminary hearing evidence in disposing of the motion; and (3) both parties cite to preliminary hearing testimony on appeal.

chemicals coming from the trailer. Georgeson went next door to Cahoon's residence and called McCoy from Cahoon's home phone. Georgeson told McCoy that he was investigating some information that Fox and Underwood had given him. He testified that McCoy informed him that Fox and Underwood had her consent to be at the trailer. However, McCoy was unaware when she received the call from Georgeson that Fox and Underwood had returned to the trailer after driving her son home to Illinois.

¶ 4. Georgeson told McCoy that he observed an unsecure gas tank at the residence and that the trailer door was open. Georgeson obtained McCoy's consent to enter the trailer by offering to check on the place and lock it up for her.

¶ 5. Georgeson ended the call with McCoy and went back to the trailer. He entered the building and observed a cooler sitting on the floor and heard water bubbling in it. He opened the cooler and identified it as a working methamphetamine lab. Georgeson immediately left the trailer. He later returned with Special Agent Jay Smith of the Division of Criminal Investigation at the Department of Justice and Juneau County Deputy Sheriff Eymard Krupa. The law enforcement officers entered the trailer twice without a warrant to collect, secure and photograph evidence.

¶ 6. Fox was subsequently charged with possession with intent to manufacture methamphetamine as a party to a crime as a repeater, contrary to Wis. Stat. §§ 961.41(1m)(e)1, 939.50(3)(f), 939.05, 939.62(1)(c) (2005–06)[2] and manufacture with the intent to deliver

---

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

drug paraphernalia as a repeater, contrary to WIS. STAT. §§ 961.574(3), 939.50(3)(h), 939.05, 939.62(1)(b).[3]

¶ 7. Fox moved to suppress the evidence seized from the trailer on grounds that it was the fruit of an illegal search. Following an initial hearing on Fox's motion, the trial court determined that Fox had a legitimate expectation of privacy in the trailer and therefore had standing to challenge the search. At a follow-up hearing, the court granted Fox's motion to suppress, ruling that the officers' warrantless search exceeded McCoy's consent and was not permissible under either the exigent circumstances or plain-view exceptions to the Fourth Amendment. We examine later in this opinion certain factual findings the circuit court made supporting its suppression order. The State appeals.

## *Discussion*

██ ██

¶ 8. On appeal, the State contends that the circuit court erred in granting the motion to suppress because Fox lacked standing to assert his constitutional right to be free of unreasonable searches and seizures. When reviewing a circuit court's ruling on a motion to suppress evidence on Fourth Amendment grounds, we uphold the circuit court's factual findings unless they are clearly erroneous. *State v. Eskridge*, 2002 WI App 158, ¶ 9, 256 Wis. 2d 314, 647 N.W.2d 434. Whether a defendant has standing to raise a Fourth Amendment claim is a question of law, which we review de novo. *Id.*

---

[3] These charges were later amended to reflect the current charges.

¶ 9. The Fourth Amendment to the United States Constitution and art. I, § 11 of the Wisconsin Constitution protects persons from unreasonable searches and seizures.[4] *State v. McCray*, 220 Wis. 2d 705, 709, 583 N.W.2d 668 (Ct. App. 1998). The Fourth Amendment "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). "Therefore, one may have Fourth Amendment protection outside of one's home." *McCray*, 220 Wis. 2d at 709.

¶ 10. To have a claim under the Fourth Amendment, the person challenging the reasonableness of a search or seizure must have standing. *State v. Bruski*, 2007 WI 25, ¶ 22, 299 Wis. 2d 177, 727 N.W.2d 503. A person has standing under the Fourth Amendment when he or she "has a legitimate expectation of privacy

---

[4] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, section 11 of the Wisconsin Constitution provides:

> **Searches and seizures.** SECTION 11. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

It appears that Fox does not make a separate argument under the Wisconsin Constitution. We therefore refer only to the Fourth Amendment in determining whether Fox has standing.

in the invaded place." *Minnesota v. Olson*, 495 U.S. 91, 95 (1990). A legitimate expectation of privacy is one which "society is prepared to recognize as reasonable." *Id.* at 95–96 (citations omitted). The defendant bears the burden of establishing his or her reasonable expectation of privacy before the circuit court by a preponderance of the evidence. *State v. Whitrock*, 161 Wis. 2d 960, 973, 468 N.W.2d 696 (1991).

¶ 11. We begin our analysis by examining the circuit court's factual findings supporting the suppression order. The circuit court found that Fox was "staying" at the trailer at the time of the search and was "using [the] mobile home as, what I would call, a cabin or a cottage." The circuit court further found that Fox had permission to stay on the premises at the time of the search.

¶ 12. The State contends that, to the extent that the finding that Fox was "staying" at the trailer and using it as a "cabin or a cottage" constitutes a determination that Fox was an overnight guest there, it is clearly erroneous. The State contends that the finding that Fox had permission to be at the trailer at the time of the search is also clearly erroneous. Upon a thorough review of the record, we agree with the State that any finding that Fox was an overnight guest at the trailer would be clearly erroneous, but we reject its challenge to the court's finding that Fox had permission to be at the trailer.

¶ 13. According to Georgeson's investigation report, Underwood said that he and Fox had visited the trailer, "but never stayed in it overnight, as they had a motel room at the Days End." Similarly, the report indicates that Fox told Georgeson that the two "stayed in a motel room that [Fox] had rented in his name" while they were in the area. Georgeson testified at the

93

preliminary hearing that Fox and Underwood told him that they did not stay overnight at the trailer, but were just using it. Underwood likewise testified that they were staying at a motel.

¶ 14. The only evidence in the record supporting a finding that Fox stayed overnight at the trailer are ambiguous statements by Georgeson and Captain Cottingham of the Juneau County Sheriff's Department that Fox and Underwood "stayed" or were "staying" at the trailer. Nothing in this testimony indicates whether "stayed" and "staying" at the trailer meant sleeping there overnight or just visiting periodically and sleeping elsewhere. In light of more specific evidence in the investigative report and the preliminary hearing testimony discussed above, the only supportable conclusion is that Fox did not sleep in the trailer overnight. Accordingly, we conclude that any finding to the contrary suggested by the circuit court's decision would be clearly erroneous.

■■

¶ 15. As for the circuit court's finding that Fox and Underwood had permission to be at the trailer, the record supports a reasonable inference that Fox had permission to be at the trailer on the day of the search, even if this inference is perhaps not the most reasonable one that may be drawn from the record. Where a record supports more than one reasonable inference, we "must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *State v. Poellinger*, 153 Wis. 2d 493, 506–07, 451 N.W.2d 752 (1990). It is undisputed that Fox had permission to be at the trailer with Terry when he first arrived there. Significantly, Fox returned to the trailer the day after driving Terry home, not days or weeks later. Further,

Georgeson testified at the preliminary hearing that Fox told him that he (Fox) and Underwood had permission to use the trailer. Under these circumstances, we conclude that the circuit court could reasonably find that Fox was resuming his visit to the trailer under the initial permission given for the visit. While McCoy testified that she was unaware that Fox and Underwood had returned to the trailer, this testimony does not render the court's finding unreasonable. Accordingly, we conclude that the circuit court's finding that Fox had permission to be at the trailer when the officers conducted the search is not clearly erroneous.

¶ 16. We turn now to the two-part test appellate courts apply when determining whether an individual has a reasonable expectation of privacy in an area. The first part of this test asks whether the individual has demonstrated an actual, subjective expectation of privacy in the area searched and in the item seized. The second part addresses "whether society is willing to recognize such an expectation of privacy as reasonable." *State v. Trecroci*, 2001 WI App 126, ¶ 35, 246 Wis. 2d 261, 630 N.W.2d 555 (citation omitted).

¶ 17. Here, the State focuses only briefly on the first element of the test, arguing that, by leaving the windows open and the trailer door ajar six to eight inches, Fox failed to exhibit a subjective expectation of privacy in the trailer. However, the record shows that the windows to the trailer were darkened with linens to prevent the public from looking inside, and the door, while ajar, was tied loosely to the door frame by a rope. This is sufficient evidence to support the circuit court's conclusion that Fox had a subjective expectation of privacy.

¶ 18. The bulk of the State's argument that Fox lacked a reasonable expectation of privacy concentrates on the second part of the test—whether it was reasonable to have an expectation of privacy under the totality of the circumstances. This is an objective test that, in most cases, is answered by reference to six factors. These include, among others, whether the person had a property interest in the premises, whether they were legitimately there and whether they put the property to some private use.[5] *Whitrock*, 161 Wis. 2d at 974.

¶ 19. But when, as here, the person challenging the search claims status as a guest on the property, we apply an alternate analysis that examines the evidence in light of the following considerations: (1) whether the guest's use of the premises was for a purely commercial purpose; (2) the duration of the guest's stay; and, perhaps most significantly, (3) the nature of the guest's relationship to the host. *See Trecroci*, 246 Wis. 2d 261, ¶¶ 56–60. In *State v. Trecroci*, the defendant sought to exclude evidence found in an attic unit leased by her fiancé. *Id.*, ¶¶ 10, 55. The defendant was a

---

[5] The six factors are as follows:

1. Whether the person had a property interest in the premises;

2. Whether the person was legitimately on the premises;

3. Whether the person had complete dominion and control and the right to exclude others;

4. Whether the person took precautions customarily taken by those seeking privacy;

5. Whether the person put the property to some private use; and

6. Whether the claim of privacy is consistent with historical notions of privacy.

*State v. Whitrock*, 161 Wis. 2d 960, 974, 468 N.W.2d 696 (1991).

day guest at the attic and was using it to dry and process marijuana. *Id.*, ¶¶ 8, 57. In assessing whether the defendant had an objectively reasonable expectation of privacy in the attic, we observed that application of the traditional six-factor test would have resulted in the conclusion that the defendant did not have a reasonable expectation of privacy in the attic where the defendant was not an overnight guest and she was not using the attic as a residence. *Id.*, ¶ 57.

¶ 20. We noted, however, that in *Minnesota v. Carter*, 525 U.S. 83 (1998), the Supreme Court "explained that the standing of a guest to challenge a search is measured by the guest's relationship to the property *and* the host." *Trecroci*, 246 Wis. 2d 261, ¶ 58. There, two defendants, who were first-time visitors for two and one-half hours in an apartment, were bagging cocaine with the tenant. *Carter*, 525 U.S. at 86. The *Carter* court concluded that the guests had no reasonable expectation of privacy in the apartment based primarily on the short duration of their stay and the fact that they used the apartment for purely commercial purposes. *Id.* at 90. The analysis of the *Carter* court distinguished a prior decision, *Olson*, which had held that an overnight guest at the home of a friend had a reasonable expectation of privacy in the residence. *Carter*, 586 U.S. at 90 (*discussing Olson*, 495 U.S. at 96–99). The *Carter* court examined the differences in the relationships that existed between the guests and their respective hosts in *Carter* and *Olson*:

> "[Defendants] here were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours. There is no suggestion that they had a previous relationship with [the tenant], or that there was any other purpose to their visit. Nor was there anything

similar to the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household. While the apartment was a dwelling place for [the tenant], it was for these respondents simply a place to do business."

*Trecroci*, 246 Wis. 2d 261, ¶ 59 (quoting *Carter*, 525 U.S. at 90). This passage, we explained in *Trecroci*, "reveals that if the guest's relationship with the host and the host's property is more firmly rooted, a guest may have standing to challenge a search." *Trecroci*, 246 Wis. 2d 261, ¶ 59. Applying this reading of *Carter* to the facts of *Trecroci*, we concluded that the defendant had a reasonable expectation of privacy in the attic leased by her fiancé based on the rootedness of her relationship with her host, and the attic, and thus had standing to challenge the reasonableness of the search. *See id.,* ¶ 61.

¶ 21. The facts of this case contrast with those of *Trecroci* and more closely resemble those of *Carter*. Fox's relationship to his hosts, Terry and McCoy, and to the trailer was not as firmly rooted as the defendant's relationship in *Trecroci* was to her host. The *Trecroci* defendant was engaged to the lessee of the attic, whereas Fox was merely a friend of the homeowner's son. The record contains little evidence of the duration or closeness of Fox's friendship with Terry or McCoy. As for the premises, Fox, like the *Carter* defendants, did not have a long-term relationship to the place, and, at the time of the search, used it for a largely (if not purely) commercial purpose, the production of methamphetamine. And, unlike *Olson*, but similar to *Carter*, Fox was not an overnight guest at the trailer; as discussed above, the record conclusively demonstrates that he slept at a motel while in the area.

¶ 22. Thus, we conclude that application of the three factors outlined in *Trecroci* weighs against Fox's claim that he had a reasonable expectation of privacy in the trailer. Fox's use of the premises upon his return was for a largely commercial purpose. His stay, while exceeding that of the *Carter* defendants, was only episodic over the course of three to four days. His relationship to his host was more attenuated than that of the defendant in *Trecroci* to her fiancé-host. Finally, Fox lacked the more firmly rooted relationship to the premises characteristic of an overnight guest (*Olson*) or a frequent visitor (*Trecroci*).

¶ 23. Accordingly, we conclude that the record demonstrates that Fox did not have an expectation of privacy in the trailer that society would recognize as reasonable. Therefore, Fox lacked standing to claim the protections of the Fourth Amendment and art. I, § 11 of the Wisconsin Constitution in objecting to the warrantless search of the trailer. Because Fox had no standing to challenge the search, the circuit court erred in reaching the merits of Fox's motion to suppress evidence. We therefore reverse the circuit court's order granting Fox's motion to suppress evidence and remand for further proceedings.

*By the Court.*—Order reversed and cause remanded for further proceedings.