COURT OF APPEALS
DECISION
DATED AND FILED

June 2, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2019AP370-CR**

Cir. Ct. No. 2016CT155

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

BARRY J. KRULL,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Shawano County: WILLIAM F. KUSSEL, JR., Judge. *Affirmed*.

¶1    STARK, P.J.[1]   Barry Krull appeals a judgment convicting him of third-offense operating a motor vehicle while intoxicated (OWI). Krull argues the circuit court erred by denying his motion to suppress. Specifically, he contends

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

the court should have granted his motion because law enforcement violated his Fourth Amendment rights by: (1) unlawfully detaining him on private property without a warrant; and (2) subjecting him to a warrantless blood draw. We reject these arguments and affirm.

## BACKGROUND

¶2      The following facts are taken from the testimony at the hearing on Krull's suppression motion. At approximately 8:38 p.m. on May 22, 2016, sheriff's deputies Jessica Bartz and David Rogers were on patrol on Highway 156 in Shawano County. They observed a vehicle, whose driver was later identified as Krull, traveling eastbound on Highway 156 at a speed of sixty-seven miles per hour in a fifty-five-mile-per-hour zone. The deputies turned their vehicle around and followed Krull onto Old 47 Road and into the driveway of a residence, which was owned by Krull's friend and co-worker, Brett Blooma.[2]

¶3      Krull drove his vehicle approximately thirty to forty feet into the driveway and then stopped. He exited the vehicle and started walking toward some individuals who were socializing near a garage. Bartz exited her vehicle and asked Krull to come back and talk to her, at which point she observed that Krull smelled of intoxicants and had slurred speech and bloodshot eyes. Krull admitted to Bartz that he had consumed four beers between 4:00 p.m. and approximately fifteen minutes before the stop. Bartz determined that Krull had two prior OWI convictions and administered field sobriety tests. After the field sobriety tests,

---

[2] The parties dispute whether Bartz activated her squad car's red and blue flashing lights before or after she turned into Blooma's driveway. However, that dispute is not material to our analysis of the issues raised on appeal.

2

Bartz asked Krull to submit to a preliminary breath test (PBT), and Krull refused to do so. Bartz placed Krull under arrest and put him in the back of her squad car.[3]

¶4 After he was placed in the squad car, Krull expressed concerns to Bartz about his two-year-old son, whom his cousin was babysitting. Krull told Bartz that his cousin expected to leave at some point, and he needed to make different child care arrangements. Krull asked several times if he could use his phone to arrange child care. Bartz told Krull he would be allowed to make phone calls if he was cooperative.

¶5 The deputies then transported Krull to a nearby hospital for a blood draw. On the way, they allowed Krull to make phone calls to arrange child care for his son. Krull testified he could have called his wife and asked her to leave work early to watch their son, but he did not want to do so because he had "other options" and did not want to interrupt her. Krull therefore arranged for his brother to watch the child instead. However, he described that arrangement as a "temporary fix" because his brother would need to leave at 4:00 the following morning. Krull testified that if he did not get home by then, his brother "would have to call in or be late" to work.

¶6 After Krull and the deputies arrived at the hospital, Bartz read Krull the Informing the Accused form and asked whether he would submit to a chemical test of his blood. Krull consented to the blood draw. While at the hospital, Krull

---

[3] The parties dispute whether Bartz stated her intention to place Krull under arrest before or after she asked him to submit to a PBT. Again, that dispute is not material to our analysis of the issues raised on appeal.

3

again asked to make phone calls to arrange child care and repeatedly expressed concern about that issue.

¶7      In his suppression motion, Krull argued evidence obtained following his detention by the deputies should be suppressed because: (1) the deputies unlawfully detained him on private property without a warrant; and (2) he was unlawfully subjected to a warrantless blood draw.  Following the suppression hearing, the circuit court denied Krull's motion in an oral ruling.  As to Krull's first argument, the court concluded Krull was not unlawfully detained on private property because the area where he was seized was not part of the curtilage of Blooma's home and Krull had no reasonable expectation of privacy in that area.  With respect to Krull's second argument, the court concluded Krull had voluntarily consented to the warrantless blood draw.

¶8      After the circuit court denied his suppression motion, Krull entered a no-contest plea to third-offense OWI.  The court sentenced Krull to forty-five days in jail, but it stayed that sentence pending appeal, pursuant to the parties' stipulation.  Krull now appeals, arguing the court erred by denying his suppression motion.

## DISCUSSION

¶9      Our review of a circuit court's decision on a motion to suppress presents a mixed question of fact and law.  *State v. Casarez*, 2008 WI App 166, ¶9, 314 Wis. 2d 661, 762 N.W.2d 385.  We accept the circuit court's findings of historical or evidentiary fact unless they are clearly erroneous.  *Id.*  The application of constitutional principles to those facts, however, presents a question of law that we review independently.  *Id.*

## I. Detention on private property

¶10    Krull first argues suppression is warranted because the deputies unlawfully detained him on private property without a warrant, in violation of his Fourth Amendment rights.    The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures.  *State v. Baric*, 2018 WI App 63, ¶17, 384 Wis. 2d 359, 919 N.W.2d 221.   In this case, Krull argues that although the deputies initially stopped his vehicle for speeding, they converted the initial stop into an investigatory detention—i.e., a *Terry* stop[4]— when they began investigating whether he had committed an OWI offense.  Krull asserts that a *Terry* stop can never occur on private property.

¶11    The State concedes—and we agree—that Krull was detained pursuant to a *Terry* stop.  Nonetheless, we reject Krull's assertion that a *Terry* stop can never occur on private property, as none of the authorities he cites support that proposition.  For instance, Krull cites WIS. STAT. § 968.24, which states that "a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime."  The fact that § 968.24 authorizes law enforcement to stop a person "in a public place" does not, however, mean that such a stop cannot occur on private property.  Those terms are not mutually exclusive, as any number of locations—for example, restaurants or shopping malls—may be both private property and public places.

---

[4]  *See Terry v. Ohio*, 392 U.S. 1 (1968).

¶12 Krull also cites *State v. Munroe*, 2001 WI App 104, ¶13 n.4, 244 Wis. 2d 1, 630 N.W.2d 223, which states that "both *Terry* and [WIS. STAT.] § 968.24 authorize [investigatory] stops in public places, not in homes or hotel rooms." Similarly, he cites *State v. Stout*, 2002 WI App 41, ¶1, 250 Wis. 2d 768, 641 N.W.2d 474, where we held that *Terry* "only applies to stops made in a public place and police may not enter an abode based on *Terry*." Again, however, the fact that a *Terry* stop must occur in a public place does not mean that it may not occur on private property. Moreover, the stop at issue in this case did not occur inside a home or a hotel room. We therefore reject Krull's argument that the stop violated his Fourth Amendment rights merely because it occurred on private property.

¶13 Krull next argues the stop violated his Fourth Amendment rights because he was detained within the curtilage of Blooma's home. "[T]he United States Supreme Court has recognized that all warrantless searches and seizures inside a home are presumptively unreasonable." *State v. Larson*, 2003 WI App 150, ¶8, 266 Wis. 2d 236, 668 N.W.2d 338 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 748-49 (1984)). "The protection provided by the Fourth Amendment to a home also extends to the curtilage of a residence." *State v. Martwick*, 2000 WI 5, ¶26, 231 Wis. 2d 801, 604 N.W.2d 552. The term "curtilage" refers to "the land and buildings immediately surrounding a house." *Id.*, ¶1 n.2. We consider four factors when analyzing whether an area falls within a home's curtilage: (1) the area's proximity to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.*, ¶30 (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

¶14 Applying the ***Dunn*** factors in the instant case, we conclude Krull was not seized within the curtilage of Blooma's home. With respect to the first factor, we observe that Krull was detained after he stopped his vehicle in a driveway about thirty to forty feet from the road and began walking toward a garage on Blooma's property. A photograph of the area in Krull's brief-in-chief shows that the driveway directly abuts the garage. A house is located on the opposite side of the driveway, but the driveway is not directly connected to it.

¶15 As for the second ***Dunn*** factor, no portion of the driveway is included within an enclosure surrounding Blooma's home. Although Krull contends the driveway "is enclosed on three sides by the residential home, a barn, and the garage," we reject this assertion, as the photograph Krull provided clearly shows that the three buildings are situated some distance apart and do not constitute an enclosure.

¶16 Turning to the third ***Dunn*** factor, we must consider the nature of the uses to which the area is put and, specifically, whether the area is used "for intimate activities of the home." ***Dunn***, 480 U.S. at 302. As already noted, Krull was detained in or near a driveway. Krull does not dispute that the driveway was used to access Blooma's property. Instead, he emphasizes that he and Blooma store their work tools in the garage. He also notes that the garage is "used as a place for social gatherings." Notably, however, Krull was not inside the garage when the deputies detained him; he was in or near the driveway leading to the garage. Krull has not cited any evidence indicating that the driveway itself was used "for intimate activities of the home" to such a degree that it should be deemed a constitutionally protected area for purposes of the Fourth Amendment.

¶17    With respect to the fourth and final **Dunn** factor, we observe that the area where Krull was seized was not concealed from public view in any way. To the contrary, the photograph provided in Krull's brief shows that the driveway is clearly visible from the road. It is not protected by a fence, vegetation, or anything else that would prevent its observation by passersby.

¶18    Considered in their totality, the **Dunn** factors do not support a conclusion that the area where Krull was seized is part of the curtilage of Blooma's home. Furthermore, we agree with the State that even if the area in question fell within the curtilage of Blooma's home, Krull would lack standing to challenge the validity of his seizure there. "To have a claim under the Fourth Amendment, the person challenging the reasonableness of a search or seizure must have standing." **State v. Fox**, 2008 WI App 136, ¶10, 314 Wis. 2d 84, 758 N.W.2d 790. To demonstrate standing, the person must establish, by a preponderance of the evidence, that he or she had a reasonable expectation of privacy in the area in question. **Id.**

¶19    Whether an individual had a reasonable expectation of privacy in an area depends on two considerations: (1) whether the individual's conduct exhibited an actual, subjective expectation of privacy; and (2) whether that expectation was legitimate or justifiable—i.e., whether society is willing to recognize the expectation as reasonable. **State v. Bruski**, 2007 WI 25, ¶23, 299 Wis. 2d 177, 727 N.W.2d 503. The following factors are relevant to the second consideration:

> (1) whether the accused had a property interest in the premises; (2) whether the accused is legitimately (lawfully) on the premises; (3) whether the accused had complete dominion and control and the right to exclude others; (4) whether the accused took precautions customarily taken by those seeking privacy; (5) whether the property was put

> to some private use; [and] (6) whether the claim of privacy is consistent with historical notions of privacy.

*Id.*, ¶24 (citation omitted).

¶20     On appeal, Krull does not cite any portion of the suppression hearing transcript in which he testified that he had a subjective expectation of privacy in Blooma's driveway. Moreover, any subjective expectation of privacy that Krull may have had in the driveway was not legitimate or justifiable. There is nothing in the record to indicate that Krull had a property interest in the driveway. While it appears Krull was lawfully in the driveway at the time he was seized, there is no evidence that he had complete dominion or control over the driveway or the right to exclude others. Furthermore, nothing in the record indicates that Krull took any precautions to ensure his privacy while in the driveway. In addition, the driveway was not put to any private use. Instead, it was used to access Blooma's property. Although some individuals were apparently socializing in or near the driveway at the time of Krull's seizure, that gathering was in plain view of the road and was therefore not particularly private.

¶21     Finally, any expectation of privacy that Krull may have had in Blooma's driveway is not consistent with historical notions of privacy. A driveway is traditionally used to access a property, and one would generally expect a driveway that is not gated or blocked in any way to be open for use by individuals other than the property owner—such as friends, delivery people, or service providers like plumbers and electricians. As the State points out, even a complete stranger may briefly enter a property owner's driveway in order to turn his or her vehicle around. In short, any expectation of privacy that Krull may have had in Blooma's driveway would be inconsistent with the traditional ways in which driveways are used.

¶22    The cases Krull cites in support of his argument that he had a reasonable expectation of privacy in the driveway are distinguishable.  In *State v. Trecroci*, 2001 WI App 126, ¶1, 246 Wis. 2d 261, 630 N.W.2d 555, multiple defendants challenged a warrantless entry into an interior stairway that led to an apartment and attic rented by some of the defendants.  In *Jones v. United States*, 362 U.S. 257, 258-59 (1960), *overruled by* ***United States v. Salvucci***, 448 U.S. 83 (1980), the defendant challenged a search of an apartment in which he was a guest.  Both an apartment and an interior stairway leading to an apartment are more private areas than a driveway that is exposed to public view.  Accordingly, neither *Trecroci* nor *Jones* compels a conclusion that Krull had a reasonable expectation of privacy under the circumstances of this case.

¶23    Ultimately, Krull has failed to establish, by a preponderance of the evidence, that he had a reasonable expectation of privacy in Blooma's driveway.  As such, even if the driveway could be considered part of the curtilage of Blooma's home, Krull would lack standing to assert that the deputies violated his Fourth Amendment rights by seizing him in the driveway without a warrant.

## II.  Warrantless blood draw

¶24    Krull next asserts that the deputies violated his Fourth Amendment rights by subjecting him to a warrantless blood draw.  A blood draw to uncover evidence of a crime constitutes a search within the meaning of the Fourth Amendment, and warrantless searches are presumptively unreasonable.  *State v. Tullberg*, 2014 WI 134, ¶¶30-31, 359 Wis. 2d 421, 857 N.W.2d 120.  Accordingly, a warrantless blood draw is constitutional only if it falls within an exception to the warrant requirement.  *Id.*, ¶30.

¶25     We agree with the State that the warrantless blood draw in this case falls within the consent exception to the warrant requirement. To determine whether the consent exception is satisfied, we first consider whether the defendant consented in fact to the search, and we then consider whether his or her consent was voluntary. *State v. Artic*, 2010 WI 83, ¶30, 327 Wis. 2d 392, 786 N.W.2d 430. Here, it is undisputed that Krull consented in fact to the blood draw. The disputed issue is whether he voluntarily consented.

¶26     It is the State's burden to demonstrate the voluntariness of a defendant's consent by clear and convincing evidence. *State v. Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998). When assessing voluntariness, we consider whether the defendant's consent was given "in the absence of duress or coercion, either express or implied." *Id.* In so doing, we consider the totality of the circumstances, including both the circumstances surrounding the consent and the defendant's personal characteristics. *Id.* at 198.

¶27     Krull argues his consent to the blood draw was involuntary because he was "extremely concerned about securing childcare for his young son" throughout the course of his interactions with the deputies. He notes that, following his arrest, he asked several times if he could use his phone to arrange child care, and Bartz responded that he would be allowed to make phone calls if he was cooperative. Krull concedes that the deputies allowed him to use his phone to make child care arrangements on the way to the hospital. Nevertheless, he asserts the arrangements he made were only a "temporary fix." He therefore contends that once he arrived at the hospital, he "felt it was necessary to submit to the blood draw if he wished to make additional phone calls." Thus, he argues that although he consented to the blood draw, "he felt pressured to do so and his decision was not the product of free and voluntary choice." Krull further asserts that his

consent to the blood draw was "in stark contrast" to his refusal to submit to a PBT, which occurred before Bartz informed him that he would only be allowed to make phone calls if he cooperated.

¶28  After considering the totality of the circumstances, we cannot conclude that Krull's consent to the blood draw was involuntary. Bartz never threatened Krull, nor did she tell him that he would not be allowed to make phone calls if he refused to consent to a blood draw. As the circuit court correctly noted, there was no "quid pro quo" here. Moreover, the deputies allowed Krull to make phone calls on the way to the hospital, even though he had previously refused to submit to a PBT. Krull was therefore able to arrange child care before he had even arrived at the hospital and before he was asked to consent to a blood draw. Although Krull asserts the child care arrangements he made were only a "temporary fix," he testified at the suppression hearing that he knew his brother would be able to stay with his child until 4:00 the following morning, and if Krull was not home by that time, his brother would have to "call in or be late" to work. This was not a situation in which Krull faced the prospect of his child being left unattended if he did not consent to a blood draw.

¶29  Krull's personal characteristics further support a conclusion that his consent to the blood draw was voluntary. The circuit court found that Krull was an "able-bodied, fairly young individual"[5] who had "some experience with OWIs" and was therefore "fairly aware of what the standards were." Krull does not argue that these findings are clearly erroneous. There is nothing in the record to suggest

---

[5] The record shows that Krull was thirty-eight years old at the time of his arrest.

that Krull's personal characteristics made him particularly vulnerable to police pressure.

¶30 Accordingly, based on both Krull's personal characteristics and the circumstances surrounding his consent, we conclude Krull voluntarily consented to the blood draw. The consent exception to the warrant requirement therefore applies, and, as such, we reject Krull's argument that the warrantless blood draw violated his Fourth Amendment rights.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.