COURT OF APPEALS
DECISION
DATED AND FILED

October 19, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2022AP1562**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019CV112

**IN COURT OF APPEALS
DISTRICT IV**

JACKSON B. PELLETT, II, JOSEPH B. PELLETT,
AND JOAN J. PELLETT,

   PLAINTIFFS-RESPONDENTS,

 V.

JUDSON PELLETT,

   DEFENDANT-APPELLANT.

        APPEAL from orders of the circuit court for Richland County: DARCY JO ROOD, Judge. *Affirmed*.

        Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Judson Pellett's father—through the agency of one of Judson's siblings—commenced this action in Richland County Circuit Court against Judson, claiming that Judson unduly influenced his parents to transfer valuable Vilas County property to him.[1] After the father's death, while the action was still pending, Judson's siblings were named as the plaintiffs and continued to pursue this action against Judson. Following a four-day bench trial, the circuit court determined in the siblings' favor that Judson had unduly influenced the parents. On that basis, the court declared invalid the quit claim deeds that the parents used to transfer the Vilas County property to Judson and issued a corresponding order for declaratory judgment. Judson appeals three circuit court rulings: (1) granting a motion to substitute the siblings for the father as the plaintiffs in this action, following the father's death; (2) determining that there was sufficient evidence of undue influence; and (3) making two evidentiary decisions that Judson argues permitted "character assassination" of Judson. We reject each of Judson's arguments and affirm.

## BACKGROUND

*Complaint filed on behalf of John Pellett*

¶2 In December 2019, Jackson Pellett commenced this action on behalf of his father, John Pellett.[2] The suit sought an order invalidating quit claim deeds to property that John and his wife Joan Pellett (collectively, "the parents")

---

[1] Multiple pertinent individuals share the surname Pellett. Therefore, we use first names after first references for those individuals.

[2] Jackson filed the action on behalf of John under the authority of a durable power of attorney for financial matters executed by John; there is no dispute that Jackson could properly initiate this action on behalf of John as he did.

executed conveying real estate and improvements to Judson Pellett, Jackson's brother. The action specifically challenged the validity of multiple deeds that the parents executed during two sets of transfers, one set in 2018 and the other in 2019. John claimed that Judson obtained the deeds by exercising undue influence over the parents. The complaint includes the following pertinent allegations.

¶3    Jackson and Judson are two of the four surviving children of the parents. At relevant times, the parents owned extensive real estate and improvements in Vilas County. In April 2014, the parents executed an estate plan calling for assets, which included the Vilas County property, to be distributed equally among the four surviving children, and the parents informed the four children of this estate plan.

¶4    Continuing our summary of the complaint's allegations, Judson had opportunities to influence his parents with respect to the disposition of their assets, particularly as they aged, suffered from infirmities, and "became more susceptible to influence." Before Joan died in 2019, Judson "used his influence to convince his parents to execute quit claim deeds transferring" to Judson alone Vilas County property with a total value exceeding $2.5 million. Further, Joan "lacked the mental capacity to execute the quit claim deeds." After the property transferred to Judson, John told Judson's siblings that the parents had made the transfers only as a result of Judson's undue influence over them. John also asked Judson to return to the parents the property subject to the deeds, but Judson would not do so.

*John's death; Judson files suggestion of death*

¶5    John died on September 25, 2021. On November 11, 2021, while this case was still pending in the circuit court, Judson's counsel filed with the court a "suggestion of death," pursuant to WIS. STAT. § 803.10(1)(a) (2021-22),

which describes the procedure for the substitution of parties following the death of a party.[3]  This came in the form of a very short filing, which advised "counsel of record" of the fact and the date of John's death.  The brief filing did not purport to identify a party to the pending action, a "successor," or a "representative of the deceased party," who would be a suitable substitute plaintiff and who therefore would need to move for substitution as the plaintiff within 90 days under § 803.10(1)(a) or else the action would be dismissed for lack of a proper plaintiff.  *See* § 803.10(1)(a).

*Motion to substitute for John as plaintiff*

¶6      On February 8, 2022, Jackson "in his capacity as authorized agent for" John filed a motion in the circuit court for an order substituting for the now deceased plaintiff John as proper plaintiffs the following individuals:  Jackson and two of his siblings, Joseph Pellett and Joanie Pellett.  The siblings took the

---

[3] WISCONSIN STAT. § 803.10 addresses methods by which parties may be substituted in pending circuit court actions under various circumstances.  The first subpart addresses the death of a current party and provides for a 90-day window for the filing of a motion for substitution:

> **(1)** DEATH. (a) If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties.  The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in [WIS. STAT. §] 801.14 and upon persons not parties in the manner provided in [WIS. STAT. §] 801.11 for the service of a summons.  Unless the motion for substitution is made not later than 90 days after the death is suggested on the record by service of a statement of the facts of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

4

position that they qualified as proper substitute parties under WIS. STAT. § 803.10(1)(a) because they were "successors ... of the deceased party." In support, the siblings' attorney submitted by affidavit copies of John's will and a revocable living trust created by the parents. Based on these documents, the siblings argued that relevant trust property is to be distributed in equal shares to the four children. Therefore, the argument continued, if the siblings as proposed plaintiffs are successful in this lawsuit, resulting in the invalidation of the quit claim deeds, then the real estate subject to the deeds "would become property of the Trust and be distributed according to the terms of the Trust," benefitting the siblings.

¶7      Judson argued in response that the substitution motion filed by Jackson on behalf of John "is a nullity" because the durable power of attorney allowing Jackson to act on behalf of John terminated when John died. In the alternative, Judson argued that the siblings could not qualify as proper party plaintiffs under WIS. STAT. § 803.10(1)(a). He contended that this was because they were neither personal representatives for John's estate nor successors as heirs, beneficiaries, or distributees of John's estate, since the estate had not yet been distributed.

¶8      Jackson replied that Judson had objected to a petition for administration of John's estate that Joanie had filed in Florida (where John resided before his death), and that this objection was an attempt to delay the appointment of a personal representative for the estate. Jackson argued that the siblings should be substituted for John as the plaintiffs or that, in the alternative, the case should be adjourned "until such time as Jud[son]'s objections in the Florida probate court can be heard and a personal representative appointed."

¶9 At a hearing devoted in part to the substitution motion, the circuit court granted the motion, allowing the siblings to substitute for John as the plaintiffs, based on the court's interpretation of WIS. STAT. § 803.10(1)(a).

*Court trial*

¶10 The undue influence claim was tried to the circuit court in March and April 2022, through both in-person and deposition testimony. One theory advanced by the siblings was the following: when Joan was in a steep decline, Judson unduly influenced her to believe that the parents should convey the property to him, and then Judson teamed up with her to unduly influence John to execute the quit claim deeds. Judson emphasized evidence raising reasonable inferences that the parents favored him over his siblings in making gifts even before giving him the challenged quit claim deeds and that the parents recognized what Judson characterized as his own special love for the Vilas County property.

¶11 After hearing oral arguments and taking the case under advisement, the circuit court issued a written opinion in which it explained its determination that "the evidence clearly, convincingly[,] and satisfactorily establishes that Judson unduly influenced the Parents regarding both the 2018 and 2019 property" transfers to Judson. Based on these determinations, the court declared the deeds invalid. Judson appeals.

## DISCUSSION

¶12 We begin with the substitution issue, because if Judson were correct on that issue then we would reverse the circuit court's decision and we would not reach the challenged trial rulings. We reject Judson's arguments on the substitution issue and therefore we address the two other issues.

## I. SUBSTITUTION MOTION

¶13     Judson argues that the circuit court erred in granting the substitution motion because the circuit court (1) misapplied the law governing whether the court could properly entertain a substitution motion filed by Jackson on behalf of John, because Jackson lacked authority to file the substitution motion on behalf of John after John's death, and (2) misinterpreted WIS. STAT. § 803.10(1)(a).  For these reasons, Judson argues, the court was required to dismiss the action based on the absence of a proper plaintiff.  We address these two issues in turn.

¶14     As to both substitution issues, the interpretation and application of the statutes and case law identified below to the undisputed relevant facts present legal issues that we decide de novo.  *See **Kersten v. H.C. Prange Co.***, 186 Wis. 2d 49, 56, 520 N.W.2d 99 (Ct. App. 1994) ("The question of whether the facts fulfill a particular legal standard is a question of law which we decide independently and without deference to the [circuit] court.").

### A.  Jackson's authority to file substitution motion; harmless error

¶15     Judson argues that the circuit court should have denied the substitution motion on the following grounds:  Jackson filed the motion on behalf of John, but by that time John had died, and therefore Jackson "had no authority to file" the motion, which renders the motion "a nullity."  The power of attorney that John executed, on which Jackson relied in initiating this action on John's behalf, stated that it was governed by Florida law.  Judson cites Florida law for the proposition that Jackson lacked authority to act on behalf of John after John's death.

¶16     The siblings respond in pertinent part that any error by the circuit court in failing to reject the motion on the ground that Jackson could not file it on John's behalf after John's death was harmless. This is because the court would have entertained and granted the motion if it had been filed by the siblings and not by Jackson on behalf of John. *See* WIS. STAT. § 803.06(1) ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just."); WIS. STAT. § 805.18(2).[4]

¶17     We assume without deciding that the circuit court erred in rejecting Judson's specific argument that, with John's death, Jackson lost authority to file the substitution motion on John's behalf. But we conclude that the circuit court would have readily entertained and granted a substitution motion by the siblings, relying in part on the broad language of WIS. STAT. § 803.06(1). With this in mind, and in light of our analysis of WIS. STAT. § 803.10(1)(a) in the following subsection of this opinion, the assumed error was therefore harmless under WIS. STAT. § 805.18(2). Put differently, we conclude that, in the words of § 805.18(2), "the error complained of has [not] affected [Judson's] substantial rights."

---

[4] WISCONSIN STAT. § 805.18(2) provides, with emphasis now added:

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or *for error as to any matter of pleading or procedure*, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

8

¶18 Explaining further, Judson alleges an error of pleading or procedure and does not develop an argument that WIS. STAT. § 805.18(2) could not apply here. Stated in the terms of WIS. STAT. § 803.06(1), the circuit court "added" "[p]arties" "by order of the court," which the court was free to do "on its own initiative at any stage of the action and on such terms as are just." Given that such a motion could so easily have been taken under consideration by the court—and from all that we can see in the record and the arguments of the parties, readily would have been taken under consideration—reversal based on the identity of the moving party (or, in Jackson's case, capacity) would make no sense on these facts.

¶19 Judson makes two arguments. First, he contends that the siblings' argument based on WIS. STAT. § 803.06(1) "was not raised before the trial court" and therefore "was waived and should not be considered on appeal." This is apparently intended as a reference to a rule of forfeiture that is properly stated as follows: a party may forfeit a legal argument or theory by failing to preserve it before the circuit court and then attempting to raise it for the first time on appeal in a way that would "blindside" the circuit court if it served as the basis for reversal. *See **Townsend v. Massey**,* 2011 WI App 160, ¶¶24-26, 338 Wis. 2d 114, 808 N.W.2d 155. Judson fails to recognize that it would not blindside the circuit court here to affirm the court on this issue and that we may generally affirm a circuit court's decision based on a rationale different from the one on which the court relied. *See **State v. Trecroci**,* 2001 WI App 126, ¶45, 246 Wis. 2d 261, 630 N.W.2d 555. Based on the record and the arguments of the parties, we conclude that affirmance on this ground is appropriate.

¶20 Second, Judson argues that application of the harmless error doctrine here would disregard "the specific language of [WIS. STAT.] § 803.10(1)(a), which provides '… the action shall be dismissed as to the deceased party' if the statute is

9

not complied with." However, we explain in the following subsection of this opinion why the "shall be dismissed" rule of § 803.10(1)(a) was not triggered here, because the suggestion of death filed by Judson failed to designate a substitute for the deceased plaintiff as required by *Wick v. Waterman*, 143 Wis. 2d 676, 679, 421 N.W.2d 872 (Ct. App. 1988).[5]

¶21 In sum, we assume that it was error for the circuit court to entertain a motion filed by Jackson on behalf of John but conclude that the assumed error was harmless.

## B. Interpretation of WIS. STAT. § 803.10(1)(a)

¶22 Judson argues that the circuit court misinterpreted WIS. STAT. § 803.10(1)(a) by granting the substitution motion. We resolve this issue on a narrow ground: Under *Wick*, the suggestion of death filed by Judson failed to trigger the potential application of § 803.10(1)(a) that could result in dismissal because the suggestion does not identify a proper party to substitute for John. *See Wick*, 143 Wis. 2d at 679-80.

¶23 Apart from the argument that we have rejected in the subsection above about who could bring the substitution motion, Judson fails to develop an argument that the circuit court's substitution ruling should be reversed if WIS. STAT. § 803.10(1)(a) does not apply. Judson also cannot dispute that the very short suggestion of death that he filed did not name a proper substitute for the

---

[5] We do not rely on references that the siblings make to the doctrine of standing. It appears that this doctrine does not apply in the context of the dispute here.

10

deceased John: a party to the action, a "successor[]," or a "representative[] of the deceased party." *See* § 803.10(1)(a).

¶24 The siblings argue in pertinent part that WIS. STAT. § 803.10(1)(a) does not apply because Judson's suggestion of death does not identify a proper party to substitute for John. This position is based on *Wick*'s statement that such identification is a required element for a suggestion of death in order to trigger the 90-day clock under § 803.10(1)(a). *See Wick*, 143 Wis. 2d at 679 (citing with approval a federal court statement "that a suggestion of death which failed to identify a proper party to substitute for a deceased defendant did not trigger the running of the 90-day period"). Any other approach would "'open the door to a tactical maneuver'" of triggering the clock under circumstances when it might be difficult for the opposing party to "'locat[e] the representative of the estate'" for purposes of substitution. *See id.* (quoting *Rende v. Kay*, 415 F.2d 983, 986 (D.C. Cir. 1969));[6] *see also Schwister v. Schoenecker*, 2002 WI 132, ¶3 n.2, 258 Wis. 2d 1, 654 N.W.2d 852 (citing and relying on *Wick* without suggesting any error in *Wick*).

¶25 Judson has three arguments on this point, none well-developed or persuasive. First, Judson asserts that the statement in *Wick* is necessarily limited to suggestions of death filed by plaintiffs regarding deceased *defendants*, and the suggestion of death here was filed by a defendant regarding a deceased *plaintiff*. It

---

[6] Regarding the reliance on federal case law, Wisconsin courts interpreting WIS. STAT. § 803.10(1)(a) have looked to federal court interpretations of the "almost identical[ly]" worded Rule 25(a)(1) of the Federal Rules of Civil Procedures for persuasive authority. *Wick v. Waterman*, 143 Wis. 2d 676, 679, 421 N.W.2d 872 (Ct. App. 1988). Neither party suggests that there have been any changes that could matter in the wording of any relevant federal or Wisconsin statute since the cases we reference were issued.

is true that both *Wick*, and one of the federal opinions that *Wick* relies on as persuasive authority, *Rende*, involved deceased defendants, not as here a deceased plaintiff. *See Wick*, 143 Wis. 2d at 678; *Rende*, 415 F.2d at 986. But Judson fails to address the fact that both courts used broad language that was not, on its face, strictly limited to decedents who are defendants; instead the focus was on the danger of injustice arising from tactical abuse of the 90-day rule. *See Wick*, 143 Wis. 2d at 679; *Rende*, 415 F.2d at 986. As the *Rende* court stated, using a broad formulation: "No injustice results from the requirement that a suggestion of death identify the representative or successor of an estate who may be substituted as a party for the deceased before [FED. R. CIV. P.] Rule 25(a)(1) may be invoked by those who represent or inherit from the deceased." *Rende*, 415 F.2d at 986. Judson is one who will inherit from the deceased. More generally, Judson simply asserts the distinction and fails to develop an argument supported by legal authority that the reasoning in *Wick* could not apply when the decedent is a plaintiff.

¶26 Second, Judson cites one federal circuit court of appeals and one federal district court as having criticized the reasoning in *Rende*, although he fails to discuss the specific grounds of criticism. At least without more development, this reference does not assist us in determining the state of the law in Wisconsin.

¶27 Third, Judson directs us to an affidavit by one of his own attorneys that was submitted to the circuit court, averring that Judson attempted at relevant times to resolve the personal representative issue, albeit without success. Judson fails to explain how any attempts that he might have made to help facilitate the appointment of a personal representative are relevant under the reasoning in *Wick*. Under that reasoning, the 90-day clock could not begin to run until the suggestion of death filed by Judson identified a proper party for substitution—regardless of

any such attempts. Because we resolve this issue based on our application of *Wick* to undisputed facts, we do not need to and do not reach Judson's argument that the circuit court committed clear error in finding that he caused or significantly contributed to delay in the appointment of a personal representative.

## II. SUFFICIENCY OF EVIDENCE TO SHOW UNDUE INFLUENCE

¶28 Judson argues that the siblings failed to prove undue influence by clear, satisfactory, and convincing evidence. Judson fails to persuade us that the circuit court made a clearly erroneous determination in concluding that he used undue influence to obtain the property through the quit claim deeds.

¶29 The siblings were required to prove their undue influence claim by clear and convincing evidence. *See Johnson v. Merta*, 95 Wis. 2d 141, 154, 289 N.W.2d 813 (1980). Because claims of undue influence are tried to a circuit court, and the court's ultimate determination on the undue influence issue is inextricably intertwined with multiple factual findings, including credibility determinations, we will not set aside the court's determination unless it is clearly erroneous. *See* WIS. STAT. § 805.17(2) (addressing fact-finding in a trial to the court); *Odegard v. Birkeland*, 85 Wis. 2d 126, 134, 270 N.W.2d 386 (1978) (treating undue influence as a question of fact, subject to what was then known as the "clear preponderance of the evidence" test); *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 643, 340 N.W.2d 575 (Ct. App. 1983) (explaining that the current "clearly erroneous" standard is substantively the same as the previous "'great weight and clear preponderance'" of the evidence test).

¶30 Under this standard:

> "The evidence supporting the findings of the trial
> court need not in itself constitute the great weight or clear

> preponderance of the evidence; nor is reversal required if there is evidence to support a contrary finding. Rather, to command a reversal, such evidence in support of a contrary finding must itself constitute the great weight and clear preponderance of the evidence. In addition, when the trial judge acts as the finder of fact, and where there is conflicting testimony, the trial judge is the ultimate arbiter of the credibility of the witnesses. When more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact."

*Noll*, 115 Wis. 2d at 643-44 (quoting *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249-50, 274 N.W.2d 647 (1979)).[7]

¶31    There are two methods by which undue influence may be shown in Wisconsin, a four-element test and a two-element test.[8] *Glaeske v. Shaw*, 2003 WI App 71, ¶27 & n.12, 261 Wis. 2d 549, 661 N.W.2d 420. Here the circuit court and the parties have most extensively addressed the four-element test, which requires proof of the following by clear, satisfactory, and convincing evidence: (1) **susceptibility**—a person who is susceptible to being unduly influenced by the alleged wrongdoer; (2) **opportunity**—the opportunity by the alleged wrongdoer to exercise undue influence on the susceptible person; (3) **disposition**—a disposition by the alleged wrongdoer to use such influence; and (4) **coveted result**—the

---

[7] The siblings accurately quote the following statement of our supreme court in this context: "Reversal is required only if the evidence in support of the contrary finding constitutes the great weight and clear preponderance." *Odegard v. Birkeland*, 85 Wis. 2d 126, 135, 270 N.W.2d 386 (1978). In reply, Judson asserts that this statement is not the law in Wisconsin, but in doing so fails even to refer to *Odegard*, much less does he explain why *Odegard* does not apply here. We remind Judson's counsel that effective advocacy, as well as the duty of candor to the court, require accurate descriptions of legal standards.

[8] Undue influence cases often arise in the context of will contests, and not challenges to conveyances such as the quit claim deeds here, but the analysis is the same. *See First Nat'l Bank of Appleton v. Nennig*, 92 Wis. 2d 518, 536, 285 N.W.2d 614 (1979) ("Undue influence in the execution of an *inter vivos* conveyance is proved in the same way that undue influence is proved in the execution of a will." (italics added)).

achievement of the result coveted by the wrongdoer. *See id.*, ¶27.[9] Further, when "clear, satisfactory[,] and convincing evidence proves the existence of any three of these elements only slight evidence is necessary to prove the fourth." *Odegard*, 85 Wis. 2d at 135. "[T]he nature and purpose of undue influence is such that it is usually exercised under cover or in secret with little or no opportunity for the presence of disinterested parties," and therefore it is usually proved through circumstantial evidence; it is because of these evidence-gathering challenges that only slight evidence on a fourth element is necessary when three elements are shown to the required level of proof. *Freitag v. Solverson*, 9 Wis. 2d 315, 317-18, 101 N.W.2d 108 (1960).

¶32     Before addressing the four elements and why we affirm on the sufficiency issue, we make a point about Judson's frequent failure on appeal to apply the proper standard of review to his discussion of three of the elements—susceptibility, disposition, and coveted result elements.[10] It would unnecessarily lengthen this opinion to mention each of the times that Judson ignores the proper standard of review in addressing these three elements. In one especially striking example, Judson asserts incorrectly that it would be "entirely appropriate for this Court to evaluate whether the trial court properly weighed the testimony of … disinterested third-party witnesses against" the "siblings' own self-serving testimony." To the extent that we do not address specific assertions that Judson

---

[9] The parties reference the two-element test in their appellate briefing, but the circuit court did not apply that test. Further, Judson does not argue that reversal would be appropriate even if the court properly applied the four-element test if it did not apply the two-element test, or appropriate even if for some reason the court could not apply the two-element test. We do not discuss the two-element test further.

[10] In contrast, as discussed below, Judson's treatment of the opportunity element is primarily limited to a narrow legal argument.

may intend to offer as arguments, it is because he fails to apply the standard of review, which requires a showing of clear error by the circuit court and not merely the identification of a reason or reasons that the court could have reasonably reached a different determination.

*Susceptibility of the parents to undue influence*

¶33    The circuit court determined that the siblings showed the element of susceptibility at the required level of proof based on the following findings:  the parents, "at the time of the transfers, were elderly, their physical health was deteriorating, Dr. Pellett was unable to withstand pressure from the combined forces of Mrs. Pellett and Judson, and both relied extensively upon Judson for their transportation and care, particularly Mrs. Pellett."  The court relied in part on testimony by Dr. Bennett Blum, a forensic and geriatric psychiatrist retained as an expert by the siblings, to the effect that Joan had traditionally had "a strong personality" but that she "became more and more subdued" with the progression of her cancer, and that John "had a rather passive personality and did not like confrontation."   The court stated that all of this evidence is relevant to susceptibility under factors listed by our supreme court:   "the testator's age, personality, physical and mental health[,] and ability to handle business affairs." *See **Odegard***, 85 Wis. 2d at 140.

¶34    Judson argues that the element of susceptibility was not met because there was evidence that the parents "were in control of their faculties, were clear about their intent, were involved in the land transfers, and had the ability to care for themselves independently of any care rendered by Jud[son]."  But in making this argument, Judson simply highlights evidence that the circuit court could have given more weight to; this does not establish a clear error of any kind.  In other

words, it is not enough to show that the circuit court could have reached a different conclusion. Judson does not come to grips with the requirement that he show clear error.

¶35 To cite one major failing, as the siblings point out, Judson's opening brief does not even attempt to address Dr. Blum's testimony, despite the fact that his testimony informed the circuit court's analysis on this element.

¶36 Judson's reply to this particular argument regarding Dr. Blum has two parts, both of which lack merit. First, Judson cites a Wisconsin Supreme Court opinion for the unremarkable proposition that a factfinder may not treat an expert's conclusion on an issue as providing proof of the underlying facts regarding that issue necessary to support the expert's conclusion. *See Dreher v. Order of United Com. Travelers*, 173 Wis. 173, 179, 180 N.W. 815 (1921) ("[T]he opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion."). But Judson fails to explain why we should conclude that the circuit court was obligated to entirely ignore Dr. Blum's testimony based on the premise that the evidence at trial was not sufficient to justify his opinions.

¶37 Second, regarding the expert testimony, Judson cites a different supreme court opinion for the equally unremarkable proposition that a factfinder may credit the testimony of a non-expert over the testimony of an expert when both testify on the same topic. *See First Wisconsin Trust Co. v. Monsted*, 233 Wis. 199, 208-09, 288 N.W. 278 (1940). Based on this proposition Judson argues that he did not "need to produce expert testimony to refute Dr. Blum's opinions." This is a non sequitur. The issue is not whether Judson could possibly have prevailed despite the fact that he did not call an expert witness to attempt to rebut

17

Dr. Blum's testimony. The issue is whether the circuit court clearly erred in making its determinations, including by relying on Dr. Blum's testimony.

¶38 Judson asserts that his "purported support of his mother's position" in favor of conveying the property "cannot be undue," because "[a]ny influence" Joan exercised "over her husband with respect to property they jointly owned is entirely proper and not undue." Judson fails to provide authority for his implied argument that the circuit court would have clearly erred in addressing the susceptibility element to the extent that the court took into account evidence supporting the siblings' theory that Judson's method included the following conduct: unduly influencing John by first unduly influencing Joan and then supporting her efforts to convince John of the same course.

*Judson's opportunity to unduly influence the parents*

¶39 The circuit court made the following findings and determined that they meet the opportunity element at the required level of proof: "There is no question that Judson had almost unlimited opportunities to unduly influence his parents. He lived with them most of the time [both in Wisconsin and] during the winters in Florida, so he had near-daily, on-going contact."

¶40 Judson does not challenge the accuracy of these findings. Instead, he primarily makes a narrow legal argument. The argument is that the circuit court's factual findings were not sufficient under a standard set by our supreme court in **Ball v. Boston**, 153 Wis. 27, 141 N.W. 8 (1913). There, the court made an observation based on what the court described as the "ordinary privacy" that distinguishes "married life" from personal relationships formed outside a marriage relationship. *Id.* at 47-48. The observation is that, for one spouse to be deemed to have an opportunity to unduly influence the other,

18

> [t]here must be pretty conclusive proof of active[,] efficient efforts to improperly seclude the person, said to have been defrauded by another, where the alleged wrongdoer and the alleged victim are husband and wife, [in order] to give the mere period and zone of isolation, even an atmosphere of suspicion.

*Id.* We agree with the siblings that these statements in *Ball* are explicitly limited to the special context of the marriage relationship and do not serve to show clear error in this case by the circuit court.

¶41 Consistent with that view, and as the siblings point out, in cases subsequent to *Ball* that are more analogous to this one than the marital relationship at issue in *Ball*, our supreme court has determined that there was an opportunity for a child to exercise undue influence over a parent. *See Ramlow v. Wolf*, 244 Wis. 115, 117, 121, 11 N.W.2d 497 (1943) (remanding for new trial at which heirs of testator could pursue claim of undue influence by daughter of testator, who lived with the testator for 19 years before her death; supreme court favorably cites circuit court determination of opportunity to influence; no discussion of "efforts to improperly seclude" spouse-testator as in *Ball*); *Freitag*, 9 Wis. 2d at 316-18 (affirming circuit court determination of undue influence by son over his mother and stating in part: "There is no question that [the son] had the opportunity to unduly influence his mother. She had lived with him … almost a year prior to her death."). It is true that, as Judson suggests, the discussion in both *Ramlow* and *Freitag* regarding the opportunity element is limited. But those opinions nevertheless serve to confirm our rejection of what appears to be Judson's only developed argument on this topic, which is to the effect that *Ball* stands for the apparent proposition that in all undue influence cases involving familial relationships, including those involving testator-child relationships, the opportunity evidence must be, in the words of *Ball*, "pretty conclusive" in

19

showing "active[,] efficient efforts to improperly seclude" the testator-parent. *See Ball*, 153 Wis. at 47-48.

¶42    Having addressed and rejected Judson's reliance on *Ball*, we do not readily discern what might remain of his argument on the opportunity element. To the extent that he intends to argue that the circuit court should have credited evidence showing that he did not prevent his siblings from having opportunities to counteract his influence on his parents, he again fails to establish clear error by showing that there was insufficient evidence on which the court could rely on in making contrary findings.

*Disposition of Judson to unduly influence the parents*

¶43    Recognizing that "[d]isposition to influence implies a willingness to do something wrong or unfair," *see First National Bank v. Nennig*, 92 Wis. 2d 518, 537, 285 N.W.2d 614 (1979), the circuit made extensive findings and observations on this element. The court concluded that the siblings had shown to the required level of proof that "Judson had the requisite disposition to influence the Parents to do something that was beneficial to him and unfair to his siblings." *See Schaefer v. Ziebell*, 207 Wis. 404, 415, 241 N.W. 382 (1932) (disposition to unduly influence is a willingness to bring about a "result favorable to [oneself] and unjust to another"). We now summarize the court's discussion.

¶44    Judson "essentially lived off" of the parents and there was "no evidence" that Judson "supported himself or contributed financially to the household" when he lived with the parents in Wisconsin and Florida. In contrast, the siblings live "independent[ly]" of parental support and "appear to have worked hard to achieve success in their respective businesses."

¶45    Judson attended estate planning seminars with the parents in Florida and "was present for the reading of the estate plan documents prepared in 2014." Based on these facts, Judson "knew that any property put into the trust would be divided equally" among the four surviving children.

¶46    Judson "was significantly involved in" the parents' transfers of Vilas County property to him through quit claim deeds in 2018. The 2018 transaction was handled by Attorney Ralph Koopman, but "Judson attended every meeting with the Parents and the attorney regarding this transfer and communicated extensively by email with Koopman." Koopman "did not meet with the Parents alone to determine their competence or their wishes, although he knew the Parents from prior representation and did not question their competence." The court also acknowledged, however, that Koopman testified to the personal opinion that the 2018 transfers were not "a result of Judson's undue influence" and that John "was very involved in the [2018] transaction[s], as well."

¶47    As to the 2019 quit claim transfers, "Judson had even greater involvement" than in 2018 because "there was not an attorney involved" in 2019, and Judson did the drafting, even though the parents could have retained for this transfer the same attorney they used to draft their 2014 estate planning documents. "It is reasonable to conclude that Judson knew the Florida counsel likely would require the Parents to submit to a competency assessment, as they did in 2014, and [that] Mrs. Pellett may not have been deemed competent."[11] "This Court draws

---

[11] In its decision, the circuit court stated that the siblings "appear[ed] to have … abandoned at trial" the specific claim that Joan was not competent to make the transfers in 2018 and 2019, but issues surrounding her capacity and vulnerability at the time of each set of transfers were addressed by the court in its findings.

the reasonable inference that Judson's involvement in the [quit claim] transactions was an effort to ensure [that] the remaining land owned by the Parents remained out of the trust."

¶48    After the 2018 and 2019 property transfers, John "asked Judson to nullify" the transfers "on several occasions," including in front of the siblings, and Judson refused. John also testified in a deposition that he wanted Judson to return the land. The parties disputed whether John was competent at the time of the deposition. The court found that John "obviously was failing at the time of the deposition," but that "considering the emotional impact of a deposition for a lawsuit he brought against his son," the length of the deposition, and John's age, "it is quite possible [that John] simply was tired" when he testified in the deposition.

¶49    "Judson clearly remained angry with his siblings and, once [this] suit was filed, he began a campaign to build support for his actions," by emailing doctors, relatives, and friends with "disparaging" comments about his siblings. The court said that it was a "reasonable inference" from the evidence that this was a long-standing position of Judson's, including one that he took with the parents: "Judson similarly disparaged his siblings and portrayed himself as a victim to his parents, at least since 2015."

¶50    Turning from the circuit court's determinations to Judson's argument on the disposition element, it is not entirely clear, but he appears to contend that the circuit court clearly erred in making findings that, compared with his siblings, he took special advantage of financial assistance from his parents. However, after the siblings cite record evidence to support the proposition that Judson took special advantage of financial assistance from the parents and note

that he fails to refute the court's rationale on this issue, he fails in his reply brief to provide citations to the record that clearly support his position.

¶51 In a similar vein, Judson suggests that the circuit court clearly erred in finding that he was aware that the parents planned for their trust property to be evenly divided among the surviving children, but after the siblings cite record evidence to support this finding; in his reply he concedes the point through silence. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶9, 304 Wis. 2d 750, 738 N.W.2d 578 (court may take failure to reply to respondent's argument as a concession).

¶52 Judson makes a series of inadequately supported and confusing references to the circuit court's findings on the following topic: that Judson expressed anger toward his siblings at various times and that these expressions supported the court's conclusion that he had a disposition to treat them unfairly in connection with the challenged property transfers. After the siblings explain why Judson's references are unavailing, Judson argues in reply that "[p]eople" generally "get angry all the time; that does not mean they act on it" and that his own expressions of anger toward his siblings could not support a determination that he had "a willingness to do something wrong or unfair." As to all related points, we conclude that Judson either implicitly concedes them, *see id.*, or fails to develop an argument supported by pertinent record citations and legal authority. If his argument is that the court's findings clash with a common sense view of human nature, we fail to see the validity of any such argument. Judson himself states on appeal that the record shows that, before the quit claim transfers, he had "lost respect for his siblings," which is consistent with the circuit court's determination.

¶53    Judson relies on the proposition that "a long course of kindly treatment of a parent by a child should" not, "in and of itself, be a basis for supporting the charge of a wicked intent or disposition to exercise undue influence." *See Schaefer*, 207 Wis. at 415.  But he fails to show that the circuit court here operated under the incorrect understanding that evidence of kindly treatment by Judson toward his parents in various ways necessarily equated to a disposition to bring about a result favorable to himself and unjust to his siblings.

*Coveted result*

¶54    Regarding the fourth element, as the circuit court here recognized, our supreme court has stated:

> [T]he element of coveted result has been said to signify more than simply a result favorable to the person who is alleged to have exerted undue influence.  The essential question is whether that person has, for no apparent reason, been favored in the will to the exclusion of a natural object of the testator's bounty.

*Merta*, 95 Wis. 2d at 159.  Applying that standard, the circuit court determined to the required level of proof that, not only did Judson obtain the property in dispute, the siblings were the "natural objects" of the parents' "bounty" and there was not a reason for them to favor Judson with such a large transfer of property.

¶55    In support, the court made the following statements.  It found that the parents "gave generously" to any surviving child "who requested money or land for a specific need, *e.g.*, to build a house (Joanie and Jackson), to build a motel to start a business (Jackson), to buy a farm (Judson)."  In contrast, however, "when making the decision to dispose of all their property on a global basis, the Parents' wish and plan was to divide the property equally among all the children."  The court stated:

> [T]here is no apparent reason Judson would have been favored to the exclusion of the others with such a large gift that consisted of all of the remaining land, including the Vilas County home in which the family congregated over the years. This gift combined with the other significant gifts from the Parents would create a great inequity in the distribution of assets among the children. This Court concludes that such an inequity would be contrary to the wishes of the Parents.

¶56 As with Judson's treatment of the susceptibility and disposition elements, his arguments regarding coveted results largely ignore the proper standard of review and improperly invite us to apply our own assessments to credibility and weight-of-the-evidence determinations that are left to the circuit court in this context. That is, Judson for the most part challenges the circuit court's decision to discredit or place little weight on specific testimony favorable to Judson, without explaining why the court could not do so without committing clear error. *See Noll*, 115 Wis. 2d at 643-44 ("'[W]hen the trial judge acts as the finder of fact, and where there is conflicting testimony, the trial judge is the ultimate arbiter of the credibility of the witnesses.'" (quoting *Cogswell*, 87 Wis. 2d at 249-50)). In particular Judson emphasizes the following: his own testimony that he cared for the parents and also that he was the only one of the surviving children who loved the Vilas County property and wanted to preserve it; and the testimony of John's nephew, Art Sommers, that the parents transferred the property to Judson because Judson "loves" it and was the only surviving child who "would really live there, use it," as opposed to seeing the property as just a source of money. But conflicting testimony that could reasonably have been credited by the circuit court included testimony that John demanded return of the property and that John was not motivated in the way that Judson testified that John was motivated—or at least not motivated to the degree that Judson has argued the point.

¶57    Judson attempts to minimize the significance of John's demand for return of the property by citing the general rule that a gift of personal property that is intended to be irrevocable when made and is fully executed by unconditional delivery is a valid gift *inter vivos*, citing **Guenther v. Guenther**, 244 Wis. 386, 393, 12 N.W.2d 727 (1944) ("A gift once made [cannot] be revoked."). But this is off point. The issue here is whether Judson used undue influence to obtain the *inter vivos* gifts, and the circuit court was free in its analysis to treat the fact of John's demand as highly probative evidence on issues that include the coveted result element. The court was free, in other words, to reasonably infer that John came to realize that (1) Judson had manipulated the parents into deviating from the parents' previous plan to equitably distribute the Vilas County land (which they viewed as family land), and (2) that the parents had already done enough to help Judson in particular through their various periodic gifts to him over the years.

¶58    Judson places great emphasis on testimony by Joseph acknowledging that, before the parents conveyed the Vilas County property to Judson alone, they had not made gifts of equal value to the surviving children but instead gifted Judson a greater share than his siblings. However, the circuit court accounted for that fact in a reasonable analysis, distinguishing between, on the one hand, reasons that, in the words of the court, "Judson would have been favored to the exclusion of the others with such a large gift that consisted of all of the remaining land, including the Vilas County home in which the family congregated over the years," and, on the other hand, generous but smaller-in-scale, isolated gifts to help Judson maintain a lifestyle and to have opportunities roughly equivalent to his siblings over the years before the trust was distributed.

¶59    As one basis for this view, the court noted the evidence of a tradition by the parents to favor Judson with gifts in an explanation that the court

considered persuasive based on all of the evidence, including Joseph's testimony, along the following lines. Joseph testified to the view that the extra gifts to Judson demonstrated consistent equal treatment of the children in the sense that the parents were trying to bring Judson up to match the financial status of his siblings, but in a way that did not extend to the family land in Vilas County. The court stated:

> The Parents readily gave the individual children who asked for assistance the assistance they requested, be it land or money. A reasonable inference to be drawn is that Judson, with his ready access to the Parents, requested the gifts he received. It also is reasonable that the Parents did not want him to have less than his financially successful siblings.

¶60 Based on all of the relevant evidence, the court found Judson's attempts to show that he had "a track record of business and work success" to be unpersuasive, and instead the court found that the parents had consistently made extra gifts to Judson because he was at least relatively financially challenged and needed assistance to roughly match the financial status of his siblings and not for any other reason. After the siblings point out Judson's failure to engage with the court's specific reasoning on this issue, Judson replies by arguing that the reasoning is "inconsistent with the court's finding that [the parents] intended to distribute their assets equally to all their children and that this amounted to a 'coveted result.'" We fail to see how the reasoning is necessarily inconsistent or unsupported by at least some of the relevant evidence. The court's reasoning demonstrates that it accounted for the parents' separate goals to use *inter vivos* gifts to support their children based on the needs that they expressed over time, while holding the family land in Vilas County separate for even distribution under the trust. In other words, the court credited the testimony that the parents sought through periodic gifts over time to bring Judson's financial status up to that of his

siblings, and also credited testimony that they were unduly influenced by him to transfer to him alone multi-million dollar, improved property that they viewed as family property.[12]

## III.  EVIDENTIARY ISSUES

¶61    Judson attempts to suggest that the circuit court clearly erred in making two evidentiary decisions that improperly prevented him from presenting rebuttal evidence regarding evidence that undermined his character.  This involves two incidents that we address in turn, one that Judson describes as barring him from rebutting "assassination" of his character and the other concerning a mounted deer head.

¶62    We affirm an evidentiary ruling if the circuit court examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach. *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698.  If the circuit court fails to delineate the factors that influenced its decision, we independently review the record to determine whether it provides an appropriate basis for the circuit court's decision.  *Id.*, ¶29.

*"Character assassination"*

¶63    We reject this argument for three reasons.

---

[12]  Judson refers to what he submits was a mistake by the circuit court in referring in its written decision to the total value of the land conveyed in the quit claim deeds as being $5 million when in fact the land was valued at $2.5 million.  But Judson fails to develop an argument that the circuit court's undue influence analysis constituted clear error as a result of a misunderstanding about the total value of the land being $5 million as opposed to $2.5 million and we discuss this topic no further.

¶64    First, Judson provides inadequate citations to the record on this issue.  Critically, there are no citations supporting his essential premise that there had been "character assassination" evidence offered against him at trial.  *See* WIS. STAT. RULE 809.19(1)(e) (briefs must contain "citations to the ... parts of the record relied on."); *State v. McMorris*, 2007 WI App 231, ¶30, 306 Wis. 2d 79, 742 N.W.2d 322 (court of appeals may choose not to consider arguments that lack proper citations to the record).  Even after the siblings in their brief call attention to this deficit in his opening brief, Judson fails in his reply brief to supply record citations to assist this court in evaluating, based on a review of specific record evidence, the precise nature of the alleged "character assassination."  The absence of record citations is all the more glaring in light of several statements in the record by the circuit court that it did not consider Judson to have been the subject of negative attacks.

¶65    Second, Judson's counsel contemporaneously gave up on the argument in the circuit court.  During the course of Judson's direct examination by his attorney, his attorney posed this question to him:

> There was an implication, to me, at least, that the fact that you haven't been involved in operating a nursing home or running a business or working for others, keeping your nose to the grind stone, means there is something wrong with you.  Do you think that means there's something wrong with you?

The circuit court sustained an objection, and the siblings' counsel said that the question contained a "mischaracterization."  The following exchange then occurred:

> [Judson's counsel]: Well, your Honor, the suggestion that the siblings were not suggesting there was something wrong with him when they said he hadn't had a job except for three months in his life, I think, is ignoring reality.  That's exactly what they were suggesting.

> [Siblings' counsel]: Not a one of them said there was something wrong with him.
>
> THE COURT: They all were —
>
> [Siblings' counsel]: And that is one he specifically put in his question.
>
> THE COURT: I thought that they were pretty accepting of it in the way they testified, other than … Josh who said that [Judson] had only worked three months. And —
>
> [Judson's counsel]: You take a more charitable view of it than I do. That's fine. I'll move on, your Honor. Thank you.

This reflects that counsel cut off the court's attempt to address the issue more fully, withdrew the question, and agreed to "move on." A party cannot interrupt a circuit court's attempt to fully explain an evidentiary ruling and announce that the party is going to "move on," only to raise it on appeal as a basis for reversal.

¶66 Third, completely undeveloped in Judson's briefing is any reason for us to conclude that the circuit court's ruling deprived it of relevant, probative evidence because it did not allow Judson to answer whether Judson thought there was "something wrong" with him, which the court sitting as a finder of fact could rationally and reasonably deem to be a vague and unhelpful question. It was a proper discretionary decision to allow counsel to "move on" to more productive topics. Notably, the circuit court did not foreclose Judson's counsel from attempting to reframe the question or to supply the court with a more firm basis that could support it. And beyond all that, Judson fails to support the suggestion that it was prejudicial to his defense for the court to consider evidence that he was generally less well-off financially than his siblings based on income that he earned, independent of gifts from the parents.

30

*Mounted deer heads*

¶67    The topic here involves testimony about two mounted heads of deer killed by hunters:  one by John at a game farm and one by Judson in the wild.  The siblings elicited testimony from Joseph that, during John's life, Judson replaced John's deer head with Judson's deer head on a wall at the family "cabin" (a residence with approximately 4,000 square feet) and that this was "demeaning" to John.  This was offered by the siblings, over Judson's objection, to purportedly demonstrate that Judson displayed controlling behavior over John during John's later years.  Then, during Judson's direct testimony, his attorney brought up the topic and the following transpired.

¶68    Counsel had Judson establish that John's deer head was the result of hunting for captive deer on an Iowa game farm, not deer in the wild.  Counsel asked if John was enthusiastic about hunting at a game farm, and there was an objection based on hearsay and the court overruled the objection.  Judson testified that John "put … off a number of times" the people who wanted him to hunt at a game farm.  Counsel then asked whether John "on other occasions, expressed derision about people who hunted deer on game farms."  Judson answered, "Many times."  Counsel then objected based on hearsay.[13]  The court explained that it was sustaining the objection because the question was not directed at the "particular incident" involving the two deer heads in this case, but instead had drifted into the general topic of attitudes about game farm hunting.  Consistent with that ruling,

---

[13] The record reflects that the objection was late.  We assume without deciding in favor of Judson that, while the record is ambiguous on the point, the circuit court sitting as factfinder considered Judson's answer to be stricken from the record and did not consider the answer, even though the objection was late.

31

counsel narrowed his question: "Did your father tell you he wanted that deer head mounted on the wall at his home?" Judson answered, "He did not."[14]

¶69 Judson's counsel then said the following:

> Your Honor, I would just like to make a one-minute offer of proof on this subject.
>
> If permitted, the witness will testify that there was a restaurant in Boulder Junction where the owner had displayed a deer head that had been shot on a game farm that, in [Judson's] presence, his father made jokes about the fact that someone would, in effect, show off a deer head that was mounted on a deer farm. We're only talking about a minute or two of testimony here, your Honor, but I understand. That's my offer of proof.

¶70 In addressing Judson's post-decision motion for reconsideration, the circuit court said that "the deer head issue" "did not influence me."

¶71 We affirm on this issue for two reasons. First, the circuit court's ruling excluding evidence about John's general distain for game farming was a reasonable application of WIS. STAT. § 904.03 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by … considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). This was at best a collateral aspect of an already attenuated point involving the relative value of mounted deer heads in the purported context of allegedly controlling behavior by Judson. Judson had already established that John's deer head was merely a "game farm" trophy, reducing its significance in the context of

---

[14] This testimony may be ambiguous, but the most reasonable interpretation in context is that John approved Judson's removal from the cabin wall of the head of John's game farm-killed deer and its replacement with the head of Judson's wild-killed deer.

this deer-hunting-oriented family, and Judson was allowed to testify that John approved Judson's removal of John's deer head from the cabin wall to replace it with Judson's deer head.

¶72 Second, even if the circuit court's ruling were clear error, it would have been harmless under the WIS. STAT. § 805.18(2) standard applied in a separate context above. This is consistent with the circuit court's comment in addressing the motion for reconsideration that the deer head topic did not factor into its decisions. To the extent that the topic might have risen to the level of being marginally relevant, the circuit court had a reasonable opportunity to consider the gist of Judson's position on the deer head topic in proper context, along with far more probative, relevant evidence.

## CONCLUSION

¶73 For these reasons, we affirm the challenged orders invalidating the quit claim deeds transferring property from the parents to Judson.

*By the Court*.—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.